548 A.2d 319

**JEANNETTE PAPER COMPANY, Appellee,**

v.

**LONGVIEW FIBRE COMPANY, Appellant.**

Superior Court of Pennsylvania.

Argued April 12, 1988.

Filed Sept. 26, 1988.

150

Michael J. Betts, Pittsburgh, for appellant.

Charles P. Falk, Pittsburgh, for appellee.

Before ROWLEY, DEL SOLE and MONTGOMERY, JJ.

MONTGOMERY, Judge:

This appeal arises from a judgment entered after a jury verdict which awarded the Plaintiff–Appellee, Jeannette Paper Company, the sum of $244,000.00 in compensatory damages and $500,000.00 in punitive damages, against the Defendant–Appellant, Longview Fibre Company. This verdict was based upon claims of breach of contract and tortious interference with contractual relations asserted by Jeannette against Longview. Numerous arguments are raised on this appeal by Longview.

Longview contends, on several grounds, that the trial court erred in not granting it judgment notwithstanding the verdict. Further, the Appellant maintains that the trial court committed reversible error in refusing to grant it a new trial. It is well-established that on an appeal from the refusal of the trial court to enter judgment for the appellant *non obstante veredicto*, the sole duty of the appellate court is to decide whether there was sufficient competent evidence to sustain the verdict, granting the verdict winner the benefit of every favorable inference reasonably to be drawn from the evidence. *Mike v. Borough of Aliquippa*, 279 Pa.Super. 382, 421 A.2d 251 (1980). A judgment notwithstanding the verdict may be entered only in a clear case. *Sperrazza v. Cambridge Mutual Fire Insurance Company*, 313 Pa.Super. 60, 459 A.2d 409 (1983). Further, a judgment n.o.v. should not be entered in cases where evidence is conflicting upon a material fact, *Burg v. Aberman*, 183 Pa.Super. 1, 128 A.2d 179 (1956), and is proper only in circumstances where the facts are such that no two reasonable persons would fail to agree that the verdict was improper. *Buck v. Scott Township*, 325 Pa.Super. 148, 472 A.2d 691 (1984). The appellate court, in considering a motion for judgment n.o.v., is required to consider the evidence, together with all reasonable inferences therefrom, in the light most favorable to the verdict winner. *Claytor v. Durham*, 273 Pa.Super. 571, 417 A.2d 1196 (1980). In

such a review, all testimony and inferences unfavorable to the verdict winner must be rejected. *Smith v. Kravitz*, 173 Pa.Super. 11, 93 A.2d 889 (1953). With regard to an appeal challenging the grant or refusal of a new trial, the appellate court will not reverse the trial court's action in the absence of an abuse of discretion or an error of law which controlled the outcome of the case. *Allison v. Snelling & Snelling, Inc.*, 425 Pa. 519, 229 A.2d 861 (1967). Mindful of such standards, we must review the pertinent facts established by the record in this case.

The record establishes that as of 1983, Plaintiff Jeannette Paper Company had been a broker of various types of industrial paper, for over 30 years. The principal product it brokered was a particular type of paper known as interleaving paper. Jeannette's most significant customer for such paper, for approximately 20 years, had been Allegheny Ludlum Steel Corporation. Allegheny Ludlum, a stainless steel producer headquartered in Pittsburgh, Pennsylvania, maintained a facility at West Leechburg, Pennsylvania, which used the interleaving paper to protect stainless steel coils from abrasion. Over the years prior to 1983, Allegheny Ludlum had secured so-called "southern" interleaving paper for use at that facility by purchases through Jeannette, which acted as the broker for several different manufacturers of that type of paper.

None of the paper manufacturers who supplied such a product to Allegheny Ludlum through Jeannette had any written brokerage contracts with Jeannette, and none had ever attempted to sell directly to Allegheny Ludlum. Each had paid Jeannette a 5% commission on sales to Allegheny Ludlum, and Jeannette presented evidence that a 5% commission was the standard in the industry for such brokerage arrangements for such products. At the time of the matters complained of in this action, Jeannette was the broker for the manufacturers providing all of the interleaving paper purchased by Allegheny Ludlum.

Allegheny Ludlum had not expressed dissatisfaction with the services provided by Jeannette, but had problems with

the southern interleaving paper produced by one of the manufacturers for which Jeannette was serving as a broker. Accordingly, Jeannette deemed it appropriate to begin to search for another supplier of such interleaving paper.

On October 13, 1983, Norman Berger, the President of Jeannette, wrote to the Defendant–Appellant, Longview Fibre Company, to inquire about Longview's interest in producing this type of interleaving paper, and identified Jeannette as a broker in the sales of such a product to customers in the stainless steel and aluminum industries. In the letter, which was addressed to R.P. Wollenberg, President of Longview, Berger detailed Jeannette's long experience as a broker for such interleaving paper. By letter dated April 18, 1983,. Longview advised Jeannette that Longview's Vice–President of Paper Sales, Donald C. Stibich, would be in touch with Jeannette in due course in response to its October 13, 1983 letter.

Later in October, 1983, Stibich telephoned Jeannette and spoke with Mr. Berger. During that telephone conversation, Stibich expressed an interest in producing and marketing the interleaving paper. Berger asked whether Longview would be agreeable to using it as a broker in order to market the product. Stibich confirmed that Longview had marketed its products through brokers in the past and said that employment of Jeannette as a broker would depend on what Jeannette could "bring to the party." In response, Berger told Stibich that Jeannette could provide numerous services and benefits to Longview in such a brokerage arrangement. Among the advantages expressed by Berger included Jeannette's extensive experience in the supply of such paper to the stainless steel industries, Jeannette's extensive knowledge of the requirements and specifications of the paper required by that industry, its awareness of industry customers, their personnel and procedures, Jeannette's ability to respond to and resolve complaints raised by customers, without the need for intercession by the manufacturer or its technical staff, Jeannette's unlimited line of credit and ability to discount suppliers' bills, and

Jeannette's willingness to pay Longview's bill when the interleaving product would be shipped, regardless of the time when the product was received or paid for by the customer.

At the conclusion of this recitation of benefits which Jeannette could provide, Stibich, according to testimony by Berger, responded, "It's very impressive. What you offer is impressive, and I would say we have a fit." Berger then stated that he was pleased that there was a "fit", and that there was a "deal" between the parties. He then advised Stibich that the first account that would be approached, which was the largest, and the one he thought they could sell Longview interleaving paper to first, would be Allegheny Ludlum. He then turned the telephone over to Peter Neft, the Vice–President of Jeannette. Neft supplied Stibich with detailed information concerning interleaving in general, Allegheny Ludlum's particular requirements for this product, names of competitors, pricing information, and more about Jeannette's functions as a broker. They specifically discussed Jeannette acting as a broker for interleaving paper for Allegheny Ludlum, which would be produced by Longview. At the conclusion of the discussion, Stibich expressed that the matters related by Neft sounded good, and arrangements were made for Neft to send samples of the paper, specification sheets, and other information to Longview. After the conversation, Neft sent the samples and information which had been discussed between the parties.

Both Berger and Neft testified that during their telephone discussion with Stibich, they repeatedly referred to Jeannette's commission rate of 5%. Further, in Neft's discussion concerning the price of the paper, he stated that it was a specific dollar amount, less the 5% commission.

After the telephone discussion between Jeannette and Longview, and the transmittal by Jeannette of samples and detailed information concerning the interleaving paper currently being purchased and accepted by Allegheny Ludlum, Longview conducted a credit investigation of Jeannette.

Thereafter, it opened a line of credit for Jeannette in its records. Internal Longview documents referenced Jeannette as an established credit customer. By letter dated November 22, 1983, Stibich advised Jeannette that Longview's east coast sales representative, Bruce Boyer, would be in communication with Jeannette. However, Boyer failed to communicate with Jeannette, and Jeannette thereafter made several unsuccessful attempts to reach Boyer by telephone, at the number provided by Stibich. The telephone number was not correct. After its attempts to reach him by telephone failed, Jeannette sent a letter dated December 6, 1983, asking Boyer to call Jeannette.

Prior to receiving any response from Boyer, however, it was discovered by Jeannette that Longview had contacted Allegheny Ludlum directly and obtained an order for interleaving paper of the type which Jeannette had discussed with Longview. Immediately upon learning this information, Berger called Stibich about the information. Stibich denied having any knowledge of Mr. Boyer having taken any order from Allegheny Ludlum. Stibich claimed, in any event, that Jeannette had not advised Longview that Allegheny Ludlum was a potential customer for the product, but rather, he asserted that Longview had become aware of Allegheny Ludlum through other sources. In fact, Stibich asserted that Jeannette had never even mentioned Allegheny Ludlum as a customer of Jeannette before that time.

The record shows that an order, dated December 5, 1983, was placed by Allegheny Ludlum directly with Longview, for 44,000 pounds of interleaving paper for delivery to Allegheny Ludlum's West Leechburg plant. The price for the paper was $550.00 per ton, essentially the same price which had been discussed by Berger in his conversation with Stibich in October, 1983. This represented Longview's first sale of interleaving paper to any customer, at any location, within Longview's 57 year history as a paper manufacturer. It is noteworthy that Boyer, the sales representative for Longview who obtained the order from Allegheny Ludlum, had served in a sales capacity with Long-

view since 1971. Since that initial order, Longview continued to supply the same plant with the same type of interleaving paper, in significant quantities, on a monthly basis. It was anticipated that sales would continue at the same level, if not increase, in the future. As of the time of the trial, Longview's interleaving sales totaled $4,880,810.00, strictly limited to Allegheny Ludlum. Since the date of the beginning of sales by Longview directly to Allegheny Ludlum, Jeannette suffered a significant drop in the volume of interleaving paper sold to Allegheny Ludlum for use at its West Leechburg plant. It appears that none of the particular type of interleaving paper sold to Allegheny Ludlum by Longview is being sold by Jeannette through a brokerage arrangement with any other supplier. The particular southern paper being manufactured and sold by Longview to Allegheny Ludlum is consistent with the samples and specifications which were provided to Longview by Jeannette in October, 1983.

The record shows evidence of attempts by Longview to eliminate or change evidence relating to the existence of an agreement with Jeannette for the brokerage of interleaving paper. After Longview's San Francisco office had opened the line of credit for Jeannette, recognizing it as a Longview customer, and sent information to Boyer regarding this, Boyer returned the information with instructions to not publish any reference to Jeannette Paper. Stibich testified that he agreed with Boyer's suggestion that Jeannette be removed from Longview's internal list of established credit customers, and such removal took place. Further, while Longview attempted at trial to create an impression that it had engaged in a comprehensive investigation of the interleaving paper market prior to its discussions with Jeannette, and that Longview secured Allegheny Ludlum as a customer independently of Jeannette, it is undisputed that none of the Longview representatives ever mentioned such investigation, or Allegheny Ludlum as a potential customer, in any of the communications of discussions with Jeannette which took place before Longview obtained an order from Allegheny Ludlum in early December, 1983. Longview did

not reasonably document any particular date when it purportedly began any investigation of the interleaving paper market, independent of the contract by Jeannette. After denying several times during his testimony that Jeannette had provided Longview with the identity of Allegheny Ludlum as a customer, during the October, 1983 telephone conversation he had with Berger, and then Neft, Longview Vice–President Stibich ultimately admitted on cross-examination that Allegheny Ludlum's existence as a potential customer was first brought to Longview's attention during that telephone discussion with the Jeannette representatives.

Based upon the evidence presented, the jury rendered a verdict to the Plaintiff in the amount of $244,000.00, as compensatory damages, representing the 5% commission on the sales of interleaving paper by Longview to Allegheny Ludlum which occurred up to the date of the trial. Further, the jury awarded Jeannette punitive damages against Longview, in the amount of $500,000.00. Defendant Longview filed motions for post-trial relief in the form of judgment n.o.v., and for a new trial. Such motions were denied by the trial court. We shall now discuss, seriatum, the various arguments raised by Longview on the instant appeal.

First, Longview contends that judgment n.o.v. should have been entered in its favor, because of the absence of mutual assent to essential terms of an agreement between the parties. In essence, Longview maintains that there was no meeting of the minds between it and Jeannette concerning a brokerage agreement between them. In support of that position, Longview points out that several details of such an arrangement were not negotiated or agreed upon, including the price which Jeannette would pay for the paper, the amount of discount or commission Jeannette would receive, the circumstances under which such rates or amounts could be changed, when and how Jeannette could make payment, possession and warehousing of the paper, and other details.

Under common-law contract principles, an agreement may not be held to fail for vagueness if the parties intended to form a contract and there is a reasonably certain basis for giving an appropriate remedy. *Greene v. Oliver Realty, Inc.*, 363 Pa.Super. 534, 526 A.2d 1192 (1987).[1] We find that under the evidence presented in the instant case, and reasonable inferences to be drawn therefrom, the jury had justification for concluding that Jeannette and Longview discussed and agreed to all of the essential terms of a brokerage relationship, during the October, 1983 telephone conversation between Stibich and Berger, and then Stibich and Neft. Further, the jury had ample evidence to find that Longview through Stibich, expressly agreed to utilize Jeannette as its broker for purposes of marketing interleaving paper to Allegheny Ludlum and to other customers in the industry. It was understood that Jeannette's commission on such sales would be 5%, which was the standard in the industry. The correspondence between the parties prior to that conversation, the disclosure to Stibich of Jeannette's most important customer for the product, and the delivery of samples and specifications to Longview by Jeannette contributed further support for the conclusion that the parties had agreed on a brokerage arrangement during the telephone conversation. Longview's subsequent establishment of Jeannette as a credit customer on its books, and unsuccessful later attempts to erase the evidence of such conduct only add further weight to the determination that an agreement was reached between the parties for a brokerage arrangement. The lack of a writing is not meaningful with regard to the question of whether or not there was an enforceable agreement, in view of the evidence that Jeannette's brokerage

1. As discussed *infra* in this Opinion, the contract in issue in this case is not governed by the Uniform Commercial Code, as it involves an agreement for a brokerage arrangement, and not an agreement for the sale of goods *per se*. However, even assuming that the Code applied in this case, the same rule would apply. See 13 Pa.C.S. § 2204(c), which provides, in pertinent part: "Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."

arrangements, during thirty years in that industry, were never in writing.

The lack of some details did not operate to preclude a finding that a contractual relationship existed between the parties. Our courts are constantly confronted with disputes between parties to a contract who have failed to provide in detail for every aspect of the relationship between them. The lack of detail in such circumstances does not prevent one from determining that there is still a binding agreement between them. In the instant case, we conclude that the jury had sufficient evidence of a contract, and that vagueness as to some terms was not so overwhelming that it voided the basic understanding which was found to exist between the parties. Accordingly, we reject the contention by Longview that indefiniteness of the agreement between it and Jeannette precluded any relief to Jeannette in this case.

■ Next, Longview asserts that the judgment of the trial court should be reversed, and judgment n.o.v. should have been entered in its favor, because the alleged contract was unenforceable due to an absence of consideration. More specifically, the Appellant maintains that Jeannette made no promises and suffered no bargain-for detriment, which would have furnished consideration for the alleged contract. In support of its position, Longview refers to the case of *Utility Appliance Corp. v. Kuhns*, 393 Pa. 414, 143 A.2d 35 (1958).

In the *Utility Appliance* case, a distributor maintained that a manufacturer had breached an oral contract for the exclusive sale and distribution of the manufacturer's products. The Supreme Court held that judgment n.o.v. should have been granted in favor of the manufacturer because of the absence of any consideration furnished by the distributor. In reaching this conclusion, the Court pointed out, *inter alia*, that the distributor did not promise to invest time, money or effort to promote the sale of the manufacturer's product, and that the distributor was under no duty to purchase any of the manufacturer's product.

160

The decision in the *Utility Appliance* case does not provide support for the position of Longview in this case, for the record reveals that Jeannette offered various promises, unlike the distributor involved in the *Utility Appliance* case. Jeannette assured Longview that Jeannette would be able to supply its expertise to identify potential purchasers of the interleaving paper which it had proposed that Longview would supply. Such expertise had been developed through Jeannette's long experience and contacts it had made in the industry. It offered to share its valuable knowledge concerning the particular needs of such customers, and introduce Longview's paper to them. Further, Jeannette promised to entertain such customers at its own expense, and to service the accounts by handling customer problems or complaints, without the necessity of any involvement by Longview or its employees. Such entertainment and servicing would have involved costs for Jeannette, and produced savings for Longview. Most importantly, Jeannette offered to guarantee payment on all orders, so as to eliminate any risk to Longview arising from a lack of payments or a delay in payments by any customers. In view of such assurances, we reject the argument by Longview that there was a lack of evidence of promises from the Plaintiff which would comprise consideration in the asserted brokerage agreement between the parties.

█ The Appellant further contends that the trial court should have granted it judgment n.o.v. because the asserted contract was unenforceable under the Statute of Frauds. The Statute of Frauds cited by Longview appears in Article Two of the Uniform Commercial Code and provides that a contract for the sale of goods for the price of $500.00 or more is not enforceable unless there is some writing sufficient to indicate that a contract has been made between the parties. See 13 Pa. C.S.A. § 2201(a). However, it is clear that Article Two of the Code applies to transactions involving the sale of goods from one party to another, rather than to agreements for services. See 13 Pa.C.S.A. § 2102.

The understanding which the jury could have justifiably found to exist between Longview and Jeannette was for the former to employ the services of the latter as a broker. It was not an agreement calling for the sale of any particular amount of any paper or other goods from the manufacturer to Jeannette. Rather, it was an understanding that Jeannette would provide services to the manufacturer in return for a 5% commission on any goods sold through such a brokerage arrangement. The Statute of Frauds does not require that such an agreement be in writing to be enforceable. Therefore, we must reject the claim that the trial court erred in refusing to grant judgment n.o.v. to Longview based upon the lack of a written agreement between the parties.

■ Longview next argues that judgment *non obstante veredicto* should have been entered in its favor by the trial court as to Jeannette's claim of intentional interference with prospective contractual relations. The Appellant argues that Jeannette failed to prove any of the elements of that tort.

In the case of *Thompson Coal Company v. Pike Coal Company,* 488 Pa. 198, 208, 412 A.2d 466, 471 (1979), relying upon its earlier discussion of the issue in *Glenn v. Point Park College,* 441 Pa. 474, 479–80, 272 A.2d 895, 898 (1971), the Supreme Court set forth the following four elements which must appear in order to establish a cause of action for intentional interference with prospective contractual relations:

(1) a prospective contractual relation;

(2) the purpose or intent to harm the plaintiff by preventing the relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual damage resulting from the defendant's conduct.

We find that all four elements were established in the proof submitted by the Plaintiff in the instant case. First,

the Plaintiff submitted sufficient evidence of a prospective contractual relation. That term is difficult to define precisely. In *Thompson Coal Company v. Pike Coal Company, supra,* 488 Pa. at 208, 412 A.2d at 471, the Supreme Court said, "It is something less than a contractual right, something more than a mere hope." In *Glenn v. Point Park College, supra,* 441 Pa. at 480–81, 272 A.2d at 898–99, the Court described this element as not a certainty, but more like a reasonable likelihood or probability. In this case, Jeannette was not able to prove with certainty that it would have continued to enjoy a contractual relationship with Allegheny Ludlum. However, it certainly satisfied the burden of showing that there was a reasonable likelihood or probability of such an uninterrupted relationship if it had been able to continue to provide the same type of interleaving paper as it had in the past, without the interference of Longview's direct sales efforts. In that regard, the evidence established that Jeannette had dealt with the specialty steel producer for many years, on behalf of several different manufacturers, selling the same type of interleaving paper. There was no evidence whatsoever to indicate that Allegheny Ludlum would have severed that relationship, had Jeannette begun to offer it the interleaving paper manufactured by Longview, which Allegheny Ludlum found to be satisfactory for its needs. Thus, the element of a prospective contractual relation was established.

The other elements of the cause of action of intentional interference with a prospective contractual relationship were also present. The Defendant's purpose or intent to harm the Plaintiff, by preventing the relation from occurring, was obvious. By selling directly to Allegheny Ludlum, without Jeannette's involvement as a broker, Longview cost Jeannette, and saved for itself, the 5% brokerage commission which Jeannette would have earned on such sales. There was certainly no privilege or justification on the part of Longview for such financial harm to the Plaintiff. The only intention Longview could have entertained, under these facts, was to eliminate Jeannette as a broker in sales of the southern interleaving paper to Allegheny Lud-

lum, and to gain the full profits in such business for itself. Finally, the element of actual damage resulting from Longview's conduct was evident. Jeannette was denied a 5% commission on all of the interleaving paper sold by Longview to Allegheny Ludlum.

Consequently, we conclude that there was ample evidence for the jury to properly find that the Defendant tortiously interferred with the Plaintiff's prospective contractual relationship with Allegheny Ludlum. Therefore, there was no error in the trial court's denial of Longview's request for judgment n.o.v. as to that aspect of the Plaintiff's case. An award of damages grounded upon the tortious interference contentions of the Plaintiff was justified.

We next turn to the assertions by Longview that a new trial should have been granted because of alleged errors in the trial court's charge to the jury. In support of this argument, the Appellant cites 13 different purported areas of error in the charge. These include asserted mistakes in the instructions which were given, as well as in the trial court's failure or refusal to include certain matters in its charge. Within the 13 major areas of alleged error raised by the Appellant are included numerous sub-groups of purported mistakes in the instructions by the trial court. Some portions of the charge challenged by the Appellant cover several pages of transcript. In making this blunderbuss attack on the charge of the trial court, the Appellant has not favored us with citation to any case precedent or other authority as support for its assertions of error.

Any detailed recitation of the Appellant's individual claims of error regarding the instructions to the jury would result in an opinion many times the length of this one. In short, none of the contentions raised by the Appellant concerning the charge of the trial court merit such a detailed analysis. Suffice it to state that we have reviewed the charge in its entirety, and find no justification for a new trial, nor any basic, fundamental, or prejudicial error. See *Segriff v. Johnston*, 402 Pa. 109, 166 A.2d 496 (1960), cert. denied 366 U.S. 941, 81 S.Ct. 1669, 6 L.Ed.2d 851 (1961) on

the scope of review in such circumstances. Therefore, we reject the Appellant's argument that the trial court erred in refusing to grant it a new trial because of claimed errors in the jury instructions.

■ Finally, the Appellant contends that the trial court improperly refused to strike the award of punitive damages against it in this case. In support of that position, it points out that punitive damages are appropriate to punish and deter only extreme behavior, and, even in the rare instances in which they are justified, are subject to strict control by the court. In support of this position, it cites *Martin v. Johns–Manville Corp.*, 508 Pa. 154, 494 A.2d 1088 (1985), in which that view was expressed by Justice Hutchinson, with one other Justice concurring and four Justices concurring in the result. Further, citing *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742 (1984) and *Chambers v. Montgomery*, 411 Pa. 339, 192 A.2d 355 (1963), Longview pointed out that punitive damages should be imposed only when the conduct of the defendant is malicious, wanton, reckless, willful or oppressive.[2]

In our opinion, the record in this case adequately established malicious, willful and egregious conduct by Longview that comprised both a breach of contract and an intentional interference with prospective contractual relationships between Jeannette and Allegheny Ludlum. Not only did the evidence show that Longview had breached its agreement to allow Jeannette to act as its broker, but it also made it evident that it used the information and samples Jeannette supplied to it, in furtherance of that contractual relationship, to steal Jeannette's principal customer. It did so with the knowledge that such actions would have a severe ad-

---

2. While the author of this Opinion has had grave reservations about the excessive amounts of punitive damages which have been awarded in other cases, it is important to note that the Appellant's challenge in the instant case is not directed toward the amount of the punitive damage verdict rendered by the jury. Longview only contends that it was inappropriate that any punitive damages be awarded. Accordingly, we do not address the amount of punitive damages determined to be appropriate by the jury in the case, as that issue is not presented for our review.

verse financial impact upon Jeannette, while operating to its own pecuniary benefit. It thereafter sought to hide its dishonesty and lack of reasonable business ethics in the transaction by efforts to eliminate evidence of both its relationship with the Plaintiff, and its reliance upon the information supplied by Jeannette which led to its direct sales to Allegheny Ludlum. In all of these circumstances, we conclude that a basis for an award of punitive damages was established. The conduct of Longview was undoubtedly malicious, willful, and egregious. Accordingly, we find no merit in Longview's final claim of error.

The Judgment of the trial court is hereby affirmed.