## Eichelberger v. Gunton Corp.

*Barry W. Hixson,* for plaintiff.
*W. Mark Mullineaux,* for defendant.

LOWE, *J.,* March 27, 1991 — On February 13, 1991 this court entered an order sustaining the preliminary objections of defendant Gunton Corporation, t/a Pella Window and Door Company, to all five counts of the amended complaint of plaintiff David Eichelberger, thereby dismissing said amended complaint with prejudice. This matter is now on appeal before the Superior Court of Pennsylvania.

In March 1987 plaintiff was hired by defendant as a full-time employee and commenced working in its warehouse. During his employment plaintiff also served as a volunteer member of the Trappe Fire Company, and in connection with this membership periodically rendered services on behalf of the Trappe Ambulance Company. On January 17, 1988 plaintiff responded to an ambulance call at 416 Main Street in Trappe where he sustained a lower-back injury while lifting an elderly and disabled woman into an ambulance for transportation to the hospital.

The next day plaintiff informed defendant of his injury. It was suggested that he visit the company physician. After examining plaintiff, defendant's physician advised him to undergo rehabilitation until such time as he was deemed able to return to work. On March 9, 1988 defendant's physician authorized plaintiff's return to work. The following day plaintiff reported to work, but was terminated by defendant prior to commencing his duties.

In plaintiff's amended complaint, he brought five counts against defendant. In counts 1 and 2 plaintiff alleged that his discharge was in violation of and discriminatory under 43 P.S. §1201 et seq., the Firemen Act, which governs job protection for volunteer firemen. Plaintiff's next two counts were brought under a wrongful discharge theory. In count 3, plaintiff alleged that the discharge violated public policy; in count 4, plaintiff alleged that defendant specifically intended to harm him. Plaintiff requested punitive damages in count 5. Subsequently, defendant filed preliminary objections to all five counts of plaintiff's amended complaint, and after argument February 8, 1991, and upon consideration of the briefs of counsel, the court sustained each of the preliminary objections. Plaintiff has filed a timely appeal with the Superior Court in which he asserts in his concise statement that sufficient facts were alleged in each of the five counts of his amended complaint to sustain a claim for relief.

The court begins its analysis by examining the Firemen Act. At the time of plaintiff's discharge, 43 P.S. §1201 read:

"No employer shall terminate an employee who is a volunteer fireman, and in the line of duty has responded to a call prior to the time he was due to report for work resulting in a loss of time from his employment."

In December 1988, nine months after plaintiff's discharge, legislation was passed (hereinafter P.L. 1102), in which 43 P.S. §1201 was amended to read:

"No employer shall terminate or discipline an employee who is a volunteer fireman, fire police or volunteer member of an ambulance service or rescue squad and in the line of duty has responded to a call prior to the time he was due to report for work resulting in a loss of time from his employment." (emphasis supplied)

Additionally, the legislature annexed 43 P.S. §1201.1 to the Firemen Act, which provides, in part:

"No employer shall discriminate against any employee because such employee has been injured in the line of duty as a volunteer fireman, fire police or volunteer member of an ambulance service or rescue squad, nor shall any employer discriminate against any employee injured in the line of duty as a volunteer fireman, fire police or volunteer member of an ambulance service or rescue squad who subsequently returns to work after receiving workers' compensation benefits . . . the term 'discriminate' shall mean to discharge or to discipline in a manner inconsistent with the employer's treatment of other similarly situated employees who are injured in the course of their employment or related activities."

In passing P.L. 1102, the legislature further provided that these amendments to the Firemen Act shall be retroactive to January 1, 1988.

Plaintiff argues that by virtue of its retroactive application, the Firemen Act affords him protection. He contends that he sustained injuries while in the line of duty as a volunteer member of an ambulance service, and pursuant to 43 P.S. §1201 defendant owed a duty not to terminate him. In the same vein, he claims that such termination was discriminatory pursuant to 43 P.S. §1201.1.

Therefore, plaintiff's argument hinges on whether P.L. 1102 is to be given effect retroactively. If it is, plaintiff is afforded protection under the Firemen Act; if it is not, the Firemen Act affords him no protection. Upon perusal of the law in this area, we conclude that these amendments are *not* to be applied retroactively, and the language of the Firemen Act, as it read March 10, 1988, controls. In *Brown v. Commonwealth, State Bd. of Pharmacy,* 129 Pa. Commw. 642, 566 A.2d 913 (1989), the Commonwealth Court, citing *Krenzelak v. Krenzelak,* 503 Pa. 373, 469 A.2d 1987 (1983), and *Bortulin v. Harley-Davidson Motor Co. Inc.,* 115 Pa. Commw. 42, 539 A.2d 906 (1988), succinctly summarized the law with regard to retroactive legislation. It is axiomatic that retroactive application of new legislation offends the due process clause if, balancing the interests of both parties, such application would be unreasonable. Retroactive laws which impair no contract and disturb no vested right, but only vary remedies or cure defects in proceedings otherwise fair, have been deemed reasonable. It is important to distinguish between statutes which impact upon procedural matters and those which affect a party's substantive rights. While it is not constitutionally objectionable to retroactively apply legislation which involves a procedural change, when a party's substantive rights are involved, the law which was in effect at the time the cause of action arose must be applied.

Applying these principles to the instant case, it is clear that retroactive application of P.L. 1102 would offend the due process clause and is therefore improper. To repeat, at the time plaintiff was discharged, a volunteer member of an ambulance service did not have a cause of action against an employer for discharging or discriminating against

him. In passing P.L. 1102 the General Assembly went far beyond curing defects or varying remedies of the Firemen Act, it created causes of actions for several classes of people, including volunteer members of ambulance services. Unquestionably, the legislation impacted upon the parties' substantive rights and not merely upon procedural matters. Plaintiff argues that defendant knew or should have known that it was implied in the law that volunteer community service personnel would be afforded the same protection as volunteer firemen. This assumption by plaintiff is unfounded. At the time of the discharge, the act clearly protected only volunteer firemen; it is manifestly unreasonable for defendant to assume that the law implied that volunteer community service personnel would be afforded the same protection. Plaintiff also points out that the purpose of P.L. 1102 was to protect the class of volunteers who are so vital to the community and vulnerable to such discrimination. The court acknowledges that volunteer ambulance service personnel are vital to the community, and believes that it was propitious for the legislature to pass P.L. 1102 in order that they too are afforded job protection under the Firemen Act. However, while the court sympathizes with plaintiff's plight, the fact remains that the legislation was passed after plaintiff's discharge and giving it effect retroactively so that he is protected would be antipathetic to well-established law.

In sustaining defendant's preliminary objections to counts 3 and 4 of plaintiff's amended complaint, the court surveyed the long line of Pennsylvania cases in which causes of action for wrongful discharge have been brought. As a general rule, an employer has the unfettered right to discharge an at-will employee for any or no reason in the absence

of a contractual or statutory prohibition. *Field v. Philadelphia Electric Co.,* 388 Pa. Super. 400, 565 A.2d 1170 (1989). However, as noted in *Geary v. U.S. Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974), and *Tourville v. Inter-Ocean Insurance Co.,* 353 Pa. Super. 53, 508 A.2d 1263 (1986), an at-will employee may have a cause of action for wrongful discharge if one of two circumstances is met: the discharge is contrary to public policy or the discharge is made with specific intent to harm. The court considers these exceptions to the general rule seriatim.

The public policy exception is a very narrow one and was discussed in *Hineline v. Stroudsburg Electric Supply Co. Inc.,* 384 Pa. Super. 537, 559 A.2d 566 (1989). Relying upon *Yaindl v. Ingersoll Rand Company,* 281 Pa. Super. 560, 422 A.2d 611 (1980), and *Turner v. Letterkenny Federal Credit Union,* 351 Pa. Super. 51, 505 A.2d 259 (1985), the Superior Court observed that the extent to which public policy governs an employer's control of his business must be determined on a case-by-case basis. A finding of a violation of a clearly defined mandate of public policy which "strikes at the heart of a citizen's social right, duties and responsibilities" constitutes sufficient grounds for a wrongful discharge cause of action. *Turner, supra,* at 55, 505 A.2d at 61. Courts have frequently frowned upon employers' discharges of employees, but nonetheless have been very reluctant to hold that their conduct contravened public policy. Two notable exceptions are *Reuther v. Fowler & Williams Inc.,* 255 Pa. Super. 28, 386 A.2d 119 (1978), and *Hunter v. Port Authority,* 277 Pa. Super. 4, 419 A.2d 631 (1980). In *Reuther,* the Superior Court concluded that discharging an employee for performing jury duty violated public policy because this is an important civic responsibility. Thus, the employee had a cog-

nizable wrongful discharge claim. In *Hunter,* an employee who had been convicted of assault and was later pardoned by the governor also had a valid cause of action for wrongful discharge because there is an established public policy against stigmatizing former offenders. However, in the vast majority of cases, the Superior Court has declined to find that employers' discharges violated public policy. For example, in *McCartney v. Meadowview Manor Inc.,* 353 Pa. Super. 34, 508 A.2d 1254 (1986), an employer's discharge of an employee for actively seeking a position with a competitor did not violate public policy; likewise, public policy was not threatened in *Betts v. Stroehmann Bros.,* 355 Pa. Super. 195, 512 A.2d 1280 (1986), in which an employee was discharged despite performing his job satisfactorily.

The specific intent to harm exception is also quite narrow and has been found to exist only under very limited circumstances. As discussed in *Geary, supra,* and *Tourville, supra,* there are two ways in which a specific intent to harm discharge can be successfully alleged. First, an employer may be held liable if it is found that he discharged an employee out of "disinterested malevolence." Here, the employee must show that there was no reason for the discharge other than a desire to hurt him. The second way an employee could make out a valid cause of action for wrongful discharge under a specific intent to harm theory is by showing that his employer discharged him with an "ulterior purpose." This necessitates a showing of malice and viciousness, which can be found by reviewing the surrounding circumstances, limited to those acts of an employer occurring shortly before, contemporaneous with, and shortly after the discharge. *Mudd v. Hoffman Homes for Youth Inc.,* 374 Pa. Super. 522, 543 A.2d 1092 (1988) presents a rare case of an

employer who specifically intended to harm its employee. In that case, an employee alleged that she was discharged in order to prevent her pension benefits from vesting. The Superior Court held that such an allegation met both the "disinterested malevolence" and "ulterior purpose" criteria, because the employer's conduct manifested a malicious desire to harm her. However, as with the public policy exception, courts seldom find a specific intent to harm. *Tourville, supra,* illustrates the unwillingness of courts to make this finding. An employee fell ill and was hospitalized. Subsequently, his employer went to his house, collected his business records, told his wife he was dying and furthermore told his former clients that he had beaten his wife, had a nervous breakdown, and kept dishonest accounts. In the Superior Court's judgment, this conduct by the employer, obdurate as it may sound, did not rise to the level of specific intent to harm.

It is clear from these cases that it is eminently difficult for a discharged employee to allege a valid cause of action against an employer under a public policy violation or specific intent to harm theory. Like many before him, plaintiff in the instant case has failed in this attempt. To recapitulate, plaintiff sustained an injury and was informed by defendant's physician that he would be forced to miss work indefinitely. In the ensuing weeks, it became apparent to defendant's management that plaintiff might be incapacitated for a considerable period of time, and therefore they elected to find a full-time replacement. Kenneth Springs, defendant's operations manager, explained the decision to replace plaintiff with Scott Braile at his December 19, 1989 deposition:

"I had called Chuck Mason [defendant's Warehouse Manager] in and we had, in [plaintiff's] ab-

sence and being unable to find out when he was going to return, hired another individual to replace him in the warehouse . . . I was advised . . . that [Mr. Braile] was a very good employee, had picked up knowledge of the business very quickly and had been a very reliable employee during the part-time period that we had hired him . . . We really had to make a decision, which of the two employees would best benefit our business . . . [There was a comparison of sales abilities and working habits between plaintiff and Mr. Braile, and the effort] put forth by Mr. Braile was more than the effort put forth by [plaintiff] in terms of being able to do the job." (N.T. 12/19/89 at 5, 22-3.)

Mr. Springs' testimony indicates that defendant's discharge of plaintiff was strictly a business decision. Following the mandate in *Betts, supra,* an employer's discharge of an employee even though he is performing his job adequately does not constitute a violation of public policy. Moreover, defendant surely had no malevolent desire to hurt plaintiff, nor did it discharge him out of wanton or viciousness. Unfortunately for plaintiff, he was a victim of circumstances, because his temporary absence from work rendered him expendable. Defendant cannot be held liable for its decision to replace him with another employee.

Because plaintiff failed to allege a valid cause of action under any of his first four counts, his claim for punitive damages under count 5 must also be dismissed. It is black letter law that punitive damages are only recoverable if a party has a separate cause of action. *Kirkbride v. Lisbon Contractors Inc.,* 521 Pa. 97, 555 A.2d 800 (1989). Furthermore, even if plaintiff alleged sufficient facts to sustain a claim for relief under one or more of his first four counts, he still would not be entitled to punitive

damages. As the Superior Court noted in *Jeannette Paper v. Longview,* 378 Pa. Super. 148, 548 A.2d 319 (1988), conduct must be outrageous, reckless, or wanton to justify punitive damages; defendant's behavior in the instant case did not approach this level.

In view of the foregoing, this court's February 13, 1991 order should be affirmed.