EMPIRE TRUCKING COMPANY, INC., Appellee

v.

READING ANTHRACITE COAL COMPANY, Reading Anthracite Company, John W. Rich, Jr., d/b/a/ Reading Anthracite Contracting Company, LLC, Barakat Associates, Ltd., WMPI Land Corp., John W. Rich, Jr., d/b/a/ WMPI PTY, LLC, Jeffrey A. Gliem, Frank Derrick, Mike Bosack, and Kenneth Troutman, Appellants.

Superior Court of Pennsylvania.

Argued Dec. 5, 2012.

Filed June 21, 2013.

Reargument Denied Aug. 22, 2013.

924

Martin J. Cerullo and Stephen T. Carpenito, Pottsville, for appellants.

Ernest D. Preate, Jr., Scranton, for appellee.

BEFORE: BOWES, J., OLSON, J., and WECHT, J.

OPINION BY WECHT, J.:

Reading Anthracite Company ["Appellant"] appeals the March 7, 2012 judgment entered following a jury verdict. The jury found Appellant in breach of its contract with Empire Trucking ["Empire"] in the amount of $299,495.18 and found Appellant to have intentionally interfered with Empire's contractual relationships. The jury awarded Empire $271,000 in compensatory damages and $1.5 million in punitive damages. Appellant asks that we reverse the trial court's denial of judgment notwithstanding the verdict ["JNOV"] or, in the alternative, grant a new trial. We affirm.

The trial court summarized the factual history of this case as follows:

There is no factual dispute about the background information related to the business relationship between [Appellant] and Empire.

According to the evidence, [Appellant] is one of a number of companies owned and operated by the Rich family. [Appellant] is in the coal business. It operates numerous mining sites from which it extracts raw coal to be sized and processed for sale to its customers at its coal processing facility known as a breaker. Other than some stock trucks to move coal stock around its breaker property, [Appellant] has no trucks of its own to haul the coal from its mining sites to the breaker, and from the breaker to its customers. For approximately eighteen years leading up to the summer of 2008, it contracted with Empire to fulfill its trucking needs. (N.T. p. 230–32). Empire had some trucks of its own which were used to haul [Appellant's] coal, but it also entered into agreements with a number of other companies to use their trucks for hauling [Appellant's] coal.

Empire had written agreements with each of its subcontractors (hereinafter "subs") by which they leased their trucks to Empire and placed their trucks and their drivers under Empire's control. The agreements all provided for an initial term of one year and continued unless and until terminated by either of the parties. The subs operated under Empire's P.U.C. license and insurance and paid eight percent of their base trucking rates to Empire.

The base rate was an amount which Empire was to be paid per ton for hauling a particular material over a specified route. Every time a new hauling route was established, Gary Lorenz for Empire and William Cox (and later Jeff Gliem) for [Appellant] would negotiate and agree on a base rate per ton for that trip.

When hauling processed coal, Empire billed [Appellant] for each load hauled by its trucks and those of its subs. [Appellant], in turn, added the amount it was paying Empire to its customers' bills as [Appellant's] fee for transporting the coal to the customer's location.

When hauling raw coal, Empire did not invoice [Appellant] for the loads. Instead, the tonnage and trip were recorded by the weighmaster at [Appellant's] breaker on raw coal worksheets. The worksheets were forwarded to [Appellant's] central office, from where checks were then issued to Empire. The subs were paid only by Empire after Empire was paid by [Appellant]. Empire paid

its subs the base rates assigned for the loads they hauled, less Empire's eight percent in accordance with the agreements between them.

A number of the subs had worked with Empire, hauling [Appellant's] raw and processed coal, for more than ten years. They had become very familiar with [Appellant's] operations, and [Appellant's] employees had come to know some of them quite well.

In 2000, the price of diesel fuel began to spike, which greatly increased the operating costs for Empire and its subs. At the time, William Cox was [Appellant's] director of operations. Lorenz of Empire sent Cox a fax requesting a fuel surcharge.

The fax included a schedule, which Lorenz said he obtained from the Department of Energy website. The schedule set forth the percentages to be used for a fuel surcharge based upon different price levels for diesel fuel. Cox agreed that the percentage would be applied to the base rate for each trip, and the fuel prices were based on the price of diesel fuel at Jack Rich, Inc., another one of the Rich family's companies. The fuel surcharge was only applied when Empire and its subcontractors were hauling processed coal. [Appellant's] customers were notified that they would be billed for the fuel surcharge as part of the delivery cost.

[Appellant] has asserted that it was error to admit into evidence the schedule that the parties had used to calculate the fuel surcharge, because it was not authenticated as having come from the Department of Energy. Lorenz had testified that he had downloaded the schedule from a website that represented the schedule to be from the Department. [Appellant] objected on the basis

that the website had not been properly authenticated.

[Appellant] has misinterpreted the court's ruling regarding the admissibility of the schedule in question. In the view of this court, it did not matter whether the Department of Energy had actually issued the schedule to be used for fuel surcharges. Testimony revealed that Lorenz had sent the schedule to Cox and proposed that it be used to calculate fuel surcharges. Cox accepted that proposal by a fax marked as Plaintiff's Exhibit No. 3. The undisputed testimony was that this schedule was used by both parties to calculate fuel surcharges to be added to the cost of transporting processed coal without interruption over the following eight years. There was no evidence that [Appellant's] acceptance of the surcharge schedule was dependent on the schedule having been created by the Department. The parties accepted the schedule as the appropriate level of surcharge to be used whatever the source of the schedule. At the time the surcharge was imposed, the price of fuel at Jack Rich, Inc. was $1.22 per gallon. As it rose from there, the percentage of the base rate billed to [Appellant's] customers as a fuel surcharge also rose. Each week, Empire would get the price of fuel from Jack Rich, Inc. and refer to the accepted schedule for the percentage to be applied to the base rate as a fuel surcharge. That surcharge was added to Empire's invoices to [Appellant]. [Appellant] then collected it from its customers. When Empire was paid on its invoices, it passed that surcharge onto whichever subcontractors hauled to the customers named on the invoices. This allowed Empire and its subs to recoup some of their increased fuel costs. Empire only kept the surcharge if one of its own trucks had made the delivery.

The fuel surcharge on hauling loads of processed coal continued to be calculated in this manner and passed on to [Appellant's] customers through at least the summer of 2008. Even though Empire and its subs were purchasing the same diesel fuel for their trucks when hauling raw coal from the mines, no fuel surcharge was paid to them on those trips until 2004.

In September of 2004, the price of fuel had risen high enough that a fuel surcharge of thirteen percent was being charged to [Appellant's] customers for processed coals. Lorenz sent Cox a letter asking that the fuel surcharge be added to loads of raw coal as well. Cox agreed, and [Appellant] started adding the fuel surcharge on its raw coal worksheets. These worksheets were sent to [Appellant's] accounting office where the fuel surcharge was added to the payments Empire received from [Appellant] for the raw coal loads. None of these facts were in dispute.

Sometime thereafter the fuel prices dropped to the point that no surcharge was needed. When they rose again in 2005, the surcharge was reinstated on the processed coal, but not on the raw coal loads.

By April of 2005, Cox had retired and was replaced as director of operations by Jeff Gliem. On April 15, 2005, Lorenz faxed Gliem a letter requesting that the fuel surcharge be reinstated on raw coal loads. Brian Rich, the president of [Appellant], acknowledged that Gliem spoke with him about paying Empire's truckers a fuel surcharge on raw coal loads and that he told Gliem to go ahead. Rich said that it was only fair to give them a surcharge on raw coal too. Gliem met with Lorenz and explained that [Appellant] passed on the fuel surcharge for processed coal to its customers. Since [Appellant] would have to absorb any surcharge on raw coal loads, Gliem proposed setting the surcharge on raw coal at half what [Appellant] was charging its customers on processed coal. Lorenz agreed.

At the end of August of 2005, Empire sent Gliem a fax requesting that the fuel surcharge on raw coal loads be increased to 18%. At the same time the fuel surcharge being assessed to customers on processed coal loads was 23%. Gliem agreed, and the weighmaster began to enter the 18% on the raw coal worksheets beginning October 1, 2005.

On October 23, 2007, Gary Lorenz, Jr. faxed a letter to Gliem asking that the raw coal fuel surcharge be increased to 23%. Gliem asked Lorenz to explain why the increase was being requested. Lorenz provided him with a breakdown of how the truckers' costs had gone up, and Gliem agreed to the increase.

The price of fuel continued to spike so that by the end of May of 2008, the fuel surcharge that [Appellant] was assessing its customers on processed coal was up to 53%. Beginning the first of June 2008, the fuel surcharge on raw coal was increased to 33%. No one could say specifically how that came about, but the inference was that Empire had requested the increase. Clearly, [Appellant] had agreed to it, because their weighmaster began adding it onto the raw coal worksheets; and he testified that [Appellant's] main office instructed him how much of a surcharge to add.

Brian Rich, [Appellant's] president, testified that sometime in 2008, he was trying to determine why [Appellant's] profits had declined and focused on an increase in transportation costs. When he learned what was being paid to Empire for the fuel surcharge on raw coal loads, he became furious. He instructed

Frank Derrick, his general manager, to meet with Gliem and the weighmaster and expressed his belief that someone in [Appellant's] ranks was getting kickbacks in exchange for the surcharges. Rich also instructed his accounting department to calculate how much the truckers' fuel costs had increased based on numbers he provided to his accountant. He instructed the accountant to use a base fuel price that was almost a dollar per gallon higher than the base fuel price that was being used to calculate the fuel surcharge assessed to [Appellant's] customers for processed fuel loads. Based on the numbers Rich provided, the accountant came up with a number for increased fuel expenses that was substantially less than what had been paid to Empire (and through Empire to its subs) over the preceding three years.

Even though Gliem had agreed to the raw coal fuel surcharge paid over that same time period, and Rich acknowledged that Gliem had the power to bind the company to his agreements, Rich decided to recoup the money that he believed to have been overpaid based on his accountant's calculations. Beginning with the payments due to Empire and its subs for work they had done in July of 2008, [Appellant] stopped paying Empire anything for its work. It was not just the fuel surcharge on raw coal loads that went unpaid. Empire was not even paid the base rate for loads of both raw and processed coal hauled by its drivers for all of July and most of August.

[Appellant] was not the only company that stopped paying Empire. So did Barakat and WMPI. Although Brian Rich initially testified that he had a "very limited role" with Barakat and WMPI, on cross-examination, he admitted that he is the vice president of WMPI and secretary of Barakat. The obvious inference is that Rich caused Barakat and WMPI also to stop paying Empire, even though Empire and its subs hauled only processed coal for Barakat and WMPI. Those two companies experienced no additional costs related to a fuel surcharge. The surcharge on processed [coal], which was always substantially higher than what [Appellant] paid to Empire as a surcharge on raw coal, was entirely passed on to their customers. In fact, Barakat and Empire, like [Appellant], continued to bill their customers a fuel surcharge for delivering loads of processed coal even though they did not pay for the fuel and they were not giving the surcharge money to the truckers who did pay for it. They just added the fuel surcharge to their profits.

Empire had completely fulfilled its obligations to Barakat and WMPI. There was no reason for them to stop their payments to Empire. Clearly, they did so at Brian Rich's behest, while at the same time he was allowing Empire to continue hauling for [Appellant], WMPI and Barakat in July and August. Because there was no justification for their withholding of payment to Empire, Barakat and WMPI agreed to entry of verdicts against them on Empire's breach of contract claims.

Although Rich had caused [Appellant], Barakat and WMPI to stop their payments to Empire, neither he nor any of his employees notified Empire that the payments were being withheld or that [Appellant] wished to terminate its agreement with Empire. In fact, whenever Lorenz inquired about why Empire had not been paid, he was told by [Appellant's] employees that the checks were just awaiting someone's signature. Since Empire was not being paid, it could not pay its subs.

At the same time that Lorenz was being assured that payment would be forthcoming and being urged to keep hauling, Gliem and [Mike Bosack, an employee of Appellant,] encouraged Lorenz to get more haulers. [Appellant] had gotten a new customer in the Mountain Top area and was hauling a lot of coal to that location. Lorenz complied with their requests and put on more truckers. These truckers were never paid anything.

Brian Rich was aware of the fuel costs Empire and its subs were experiencing in July and August of 2008. The Rich family sold fuel to Empire and most of its subs through Jack Rich, Inc. At the same time, the fuel surcharge that [Appellant] was assessing its customers on processed coal had risen to over 50%, reflecting how high the price of diesel fuel had become.

By August 27, 2008, Empire and all of its subs were in dire financial straits. They had all charged fuel purchases, which were now overdue; and they all owed truck payments. Of course, the individuals who owned Empire and the trucking companies which were working as Empire subs were also experiencing personal financial distress due to the total absence of payments over nearly two months. With no income, they were falling behind on mortgage payments and personal bills. With nothing but assurances that the check was coming, on August 27, 2008, Lorenz finally informed Bosack that he could not afford to keep trucking without money to pay his bills, but that he would be back when he was paid. Lorenz did not tell any of Empire's subs to stop hauling. Some showed up the next day at [Appellant's] facility, ready to work with Empire decals still on their trucks.

There was testimony that other trucking companies were out there who might have been looking for work, but even if they could have been found quickly, they would not have been familiar with [Appellant's] operation and the routes to be driven. Empire's subs had been working with [Appellant] for many years. If Empire's subs had refused to haul for [Appellant] directly, [Appellant] would only have two days to get new truckers hauling before it would have to close down its mines and/or breaker operations.

Derrick and Gliem approached Empire's subs about working directly for [Appellant]. They told the subs that Empire had quit hauling for [Appellant]. When the subs asked whether it was true that Empire had not been paid by [Appellant], Derrick told them that as far as he knew, Empire had been paid and that no one had told him that the checks had not been issued. This, of course, was not true, because, as Derrick testified, Lorenz had complained to him about not getting paid when Derrick met with him a few days before. Several of the subs testified that Derrick and Gliem both told them that Empire had been paid in full. Both knew that was not true.

Derrick and Gliem met with the subcontractors one or two at a time. As Gliem testified, Derrick's idea was to "divide and conquer." The subs were told that Empire had been fired, but the subs could continue to haul directly for [Appellant], only without a fuel surcharge. The subs were by then deeply in debt and behind on their business and personal bills. As they testified, they had no choice but to agree.

Trial Court Opinion ["T.C.O."], 4/25/12, at 4–13 (citations omitted).

Following the jury verdict, Appellant filed timely post-trial motions. The trial court failed to rule on the motions for one

hundred and twenty days, causing Empire to praecipe the prothonotary to enter judgment against Appellant pursuant to Pa. R.C.P. 227.4. On March 7, 2012, judgment was entered. On April 2, 2012, Appellant filed a timely notice of appeal. The trial court did not order Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Nevertheless, on April 25, 2012, the trial court filed a Rule 1925(a) opinion.

Appellant presents the following issues for our review:

Tortious Interference with Contractual Relations

1) Whether the trial court abused its discretion when it allowed the tortious interference issue to go to the jury and failed to set aside the jury's finding of liability for tortious interference with contractual relations?

2) Whether it was error for the trial court to permit the jury to base compensatory damages on the revenue from all of [E]mpire's subcontractors in the absence of evidence as to interference with any or all of them and further to extend said calculation to three (3) years?

Punitive Damages

3) Whether the trial court's allowing the issue of punitive damages to go to the jury, or its failure to set aside the jury's award of punitive damages was an abuse of discretion because there was no evidence of record to support a finding that any conduct of representatives of [Appellant] was outrageous, wanton, willful, or in reckless disregard to the rights of [Empire]?

4) If the compensatory [*sic*] damages were calculated in error, should the punitive damage award be set aside in light of United States Supreme Court decisions as to the constitutionality of punitive damages being suspect when there is a ratio of punitive damages to compensatory damages greater than [10 to 1]?

5) Whether the trial court erred in not finding that jury's punitive damages verdict is grossly disproportionate to I) the character of [Appellant's] acts and II) the nature and extent of harm suffered by Empire Trucking?

6) Whether the trial court erred in not finding that jury's verdict awarding punitive damages was so grossly excessive in light of the evidence adduced as to shock the conscience of the court?

Appellant's Brief at 4–5.[1]

Appellant first asserts that the trial court committed an abuse of discretion in allowing the tortious interference claim to go before a jury. Appellant argues that the gist of the action doctrine[2] applies and acts to bar Empire's tort claim. Empire replies that this issue is waived. We are constrained to agree.

■ Our review of the record indicates that Appellant failed to raise the gist of the action doctrine at trial or in post-trial motions. Appellant highlights the trial

---

1. During oral argument, Appellant expressly withdrew its three breach of contract issues. Accordingly, we do not list those issues here, and will not review them. Further, despite the wording of Appellant's second issue, Appellant does not present any argument as to the three-year extension of the damages calculation in the body of its argument for issue two. Accordingly, that aspect of Appellant's second issue is waived. *Commonwealth v. Spotz*, 610 Pa. 17, 18 A.3d 244 (2011) (failure to set forth a legal argument on appeal results in waiver of that issue).

2. The gist of the action doctrine bars a plaintiff from "re-casting ordinary breach of contract claims into tort claims." *Mirizio v. Joseph*, 4 A.3d 1073, 1079 (Pa.Super.2010).

judge's mention of the word "gist," but this offhand remark does not suffice for preservation. *See* Notes of Testimony ["N.T."], 10/3–6/11, at 433–34. The trial judge, not Appellant, used the word "gist" in reference to Empire's evidence. *Id.* The judge was not discussing the gist of the action doctrine. Appellant does not cite any place in the record where Appellant actually raised the doctrine that it now asserts. *See* Pa.R.A.P. 2119(e) (requiring Appellant to set forth the place in the record where the issue on appeal was raised before the trial court). Empire also asserts that Appellant failed to raise this issue in its post-trial motion. Empire's Brief at 21. Our review of the record confirms Empire's assertion. Appellant first raised the issue in its brief in support of the post-trial motion. Pursuant to Pa.R.C.P. 227.1, grounds for post-trial relief must be set forth in a post-trial motion. If not, those grounds are waived. Pa.R.C.P. 227.1; *see Harborcreek Twp. v. Ring*, 131 Pa.Cmwlth. 502, 570 A.2d 1367, 1371 (1990) (grounds for relief raised for the first time in a brief in support of post-trial motion, and not in the motion itself, are waived). Appellant failed to raise the gist of the action doctrine before trial, during trial, and in its post-trial motion. Accordingly, this issue is waived. *Id.*

■ Appellant's second issue sets forth the argument that Empire failed to establish any of the elements of tortious interference with a contractual relationship, warranting JNOV. Our standard of review of a denial of a motion for JNOV is well-settled:

> Appellate review of a denial of JNOV is quite narrow. We may reverse only in the event the trial court abused its discretion or committed an error of law that controlled the outcome of the case. *Hutchinson v. Penske Truck Leasing Co.*, 876 A.2d 978, 984 (Pa.Super.2005)

(citations and quotations omitted). "Abuse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias or ill-will." *Id.*

> When reviewing an appeal from the denial of a request for [JNOV], the appellate court must view the evidence in the light most favorable to the verdict[-]winner and give him or her the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences.... Thus, the grant of a judgment n.o.v. should only be entered in a clear case and any doubts must be resolved in favor of the verdict[-] winner. Furthermore, [i]t is only when either the movant is entitled to judgment as a matter of law or the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant that an appellate court may vacate a jury's finding.

*Hutchison ex rel. Hutchison v. Luddy*, 896 A.2d 1260, 1265 (Pa.Super.2006) (citations and quotations omitted).

*Thomas Jefferson Univ. v. Wapner*, 903 A.2d 565, 569 (Pa.Super.2006).

■ We have explained that a party is liable for pecuniary loss due to tortious interference with a contractual relationship when the party "intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract ...". *Walnut St. Assoc., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 98 (Pa.Super.2009), *aff'd*, 610 Pa. 371, 20 A.3d 468 (2011). Appellant asserts that it is entitled

to JNOV because Empire failed to establish any elements of tortious interference with a contractual relationship, which are as follows:

> (1) [T]he existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct.

*Id.* (citing Restatement (Second) of Torts § 766 (1979)). Based upon our review of Appellant's claims and the record, we find sufficient evidence to support the jury's verdict, and conclude that the trial court did not abuse its discretion in denying JNOV.

 We begin with a review of the first element required to sustain a finding of tortious interference with a contractual relationship: the existence of a contract. Appellant asserts that, while written contracts between Empire and the subcontractors did exist, the contracts only covered one full year. *See* Plaintiff's Exhibits, Lease Agreement, 2, 3, and 4. After that year passed, Appellant asserts that, by its own terms, the contract defaulted to a day-to-day contract, which essentially constituted at-will employment. *See Id.* Presuming that the subcontractors' employment was at-will, Appellant further asserts that no contract between Empire and the subcontractors existed with which Appellant could interfere. Appellant's Brief at 19–20. In making this argument, Appellant overlooks evidence presented by Empire at trial. Under our standard of review, we are to view the evidence in the light most favorable to Empire as verdict winner, not Appellant. *Thomas Jefferson Univ.,* 903 A.2d at 569.

In denying JNOV, the trial court found that the subcontractors were not employees of Empire, but rather independent contractors. T.C.O. at 19. The trial court also found that the subcontractors executed lease agreements with Empire, leasing their trucks and their services as drivers, beginning on the day of execution and continuing until terminated by either party. *Id.; see also* Plaintiff's Exhibits 2, 3, and 4. Empire and two subcontractors testified that Empire and the leased truckers had a contract, and that neither party ever terminated that contract. N.T. at 325, 343, 143–42. The fact that the contract was never terminated was further supported by the actions of the subcontractors, who were at Appellant's operation centers, with the Empire logo on their trucks, loading Appellant's coal when they were approached by Appellant's agents and solicited to work directly for Appellant. *Id.* at 312–14, 320–25. The subcontractors continued to perform as though the contract was in effect, further substantiating the fact that the contract was in existence at the time of the alleged interference. Having reviewed the record, we conclude that Appellant presented sufficient evidence such that the jury could determine that a contract between Empire and the subcontractors existed.

 Next, Appellant asserts that Empire failed to establish the second element of tortious interference with a contract, which requires a showing that Appellant intended to harm Empire by interfering with Empire's contract with its subcontractors. "The second element requires proof that the defendant acted 'for the specific purpose of causing harm to the plaintiff.'" *Phillips v. Selig,* 959 A.2d 420, 429 (Pa.Super.2008) (quoting *Glenn v. Point Park College,* 441 Pa. 474, 272 A.2d

895, 899 (1971)). The second element of this cause of action is closely intertwined with the third element, which requires a showing that Appellant's actions were not privileged. *See* Restatement (Second) of Torts § 766. Thus, in order to succeed in a cause of action for tortious interference with a contract, a plaintiff must prove not only that a defendant acted intentionally to harm the plaintiff, but also that those actions were improper. In determining whether a defendant's actions were improper, the trial court must take into account the following factors listed in Restatement (Second) of Torts section 767:

> (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.

Restatement (Second) of Torts § 767; *see, e.g., Adler Barish Daniels Levin & Creskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175, 1184 (1978); *Phillips*, 959 A.2d at 429–30.

Courts require a showing of both harm and improper conduct because we have recognized that some intentionally harmful conduct is done "at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff." *Phillips*, 959 A.2d at 430. The comments to the Restatement (Second) of Torts § 767 shed further light on the interests being balanced in this analysis:

> The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should

be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation. This Section states the important factors to be weighed against each other and balanced in arriving at a judgment; but it does not exhaust the list of possible factors.

Restatement (Second) of Torts § 767 cmt. b. We further have explained that:

> In making this "choice of values" in individual cases, our Supreme Court has advised that when the purpose of the defendant's conduct is, in whole or in part, to protect a legitimate right or interest that conflicts with the interests of the plaintiff, "a line must be drawn and the interests evaluated." *Glenn*, 441 Pa. at 482, 272 A.2d at 899. Although this evaluation of interests is not always susceptible of "precise definition," it is clear that the central inquiry is whether the defendant's conduct is "sanctioned by the 'rules of the game' which society has adopted." *Id.;* [*Triffin v. Janssen*, 426 Pa.Super. 57, 626 A.2d 571, 575 (1993) ] (refusal to consent to withdrawal of opposing party's attorney was not improper because conduct was consistent with the rules of court); [*Small v. Juniata College*, 452 Pa.Super. 410, 682 A.2d 350, 354 (1996) ] (players on football team did not act improperly by voicing negative opinions of coach to college administration, which, upon investigation, discharged him, since in the academic world students are encouraged to voice their opinions).

*Phillips*, 959 A.2d at 430.

In support of its claim, Appellant again presents only the evidence most favorable to it and disregards Empire's evidence, contrary to our standard of review. *See Thomas Jefferson Univ.*, 903 A.2d at 569. Appellant asserts that it did not make any

statement to the subcontractors that would cause the subcontractors to stop working for Empire. Appellant's Brief at 23. Appellant acknowledges that it did recruit subcontractors, but maintains that it did so only after Empire stopped working for Appellant. Appellant reasons that, because Empire's business relationship with the subcontracted had already ended, Appellant's actions did not interfere with that contract. *Id.* at 25. Finally, Appellant states that it was acting to protect legitimate business interests. *Id.* at 26.

■ Empire's evidence at trial established that Appellant believed that it had been overpaying Empire as a result of an agreed upon fuel surcharge. N.T. at 523–24. Appellant ceased payment to Empire, but continuously told Empire that "the check's coming." *Id.* at 140–41. Appellant admitted that it informed Empire that "the payment was taken care of." *Id.* at 252. Despite these assurances, Empire was never paid, causing Empire and its subcontractors to suffer financial strain. *Id.* at 127–35, 324. Once the subcontractors were in financial distress, Appellant collected the names and phone numbers of the subcontractors and either called them or approached them in person, offering to employ them directly, but without payment of fuel surcharges. *Id.* at 309, 327–26, 344, 382–83, 547–50. When Appellant made the employment offers, the subcontractors were still under contract with Empire. Appellant falsely told the subcontractors that Empire had been paid in full for the subcontractors' work, implying that Empire (not Appellant) was wrongly withholding the subcontractors' pay. *Id.* at 307. Appellant also told the subcontractors that Empire had either quit or been fired, neither of which was true. *Id.* at 307, 315, 346. In fact, Appellant had failed to send Empire multiple pay checks, and yet Empire continued working for Appellant in good faith for as long as was tenable. *Id.* at 127–35, 324. The subcontractors accepted employment with Appellant because they were under financial duress as a result of not being paid by Empire. *Id.* at 308–09, 326, 346–47.

Appellant counters that the only actionable "interference" alleged by Empire amounted to defamatory statements, which cannot be the basis for a tortious interference claim. Appellant's Brief at 24–25. Appellant admits that it falsely told the subcontractors that Empire had been paid when it had not, but asserts that these statements were made only after Empire had stopped performing work for Appellant. However, as indicated above, Empire was never fired, nor officially stopped working for Appellant. *Id.* at 307, 315, 346. Rather, Empire was unable to continue hauling coal for Appellant because it could no longer afford fuel as a direct result of Appellant's failure to pay, even though Appellant assured Empire that payment was forthcoming. *Id.* at 135–36, 140–42.

■ Appellant also asserts that its actions were privileged because they were motivated by a desire to protect Appellant's own legitimate business interest. In particular, Appellant contends that it "was attempting to obtain less costly trucking services, which is a legitimate business interest." Appellant's Brief at 26. In support of this argument, Appellant cites a single case: *Glenn, supra.* However, establishing that it acted to protect a legitimate business interest alone does not privilege Appellant's actions. Appellant's actions to achieve that interest also must not be improper. *See* Restatement (Second) of Torts § 766. As discussed above, at the heart of this inquiry is a determination of whether Appellant's conduct was "sanctioned by the 'rules of the game' which society has adopted." *Phillips,* 959

A.2d at 430 (quoting *Glenn*, 272 A.2d at 899.).

Viewing the record in the light most favorable to Empire as verdict-winner, the evidence established that Appellant wrongfully withheld payment to Empire, and then told several lies to both Empire and the subcontractors. Appellant falsely told the subcontractors that Empire had been paid, when it had not, encouraging the subcontractors to feel animosity toward Empire. Appellant caused Empire and, resultantly, the subcontractors financial hardship in order to create a situation in which the subcontractors had no choice but to work directly for Appellant without receiving compensation for the higher price of fuel.

In a similar scenario, our Supreme Court has held that JNOV was improper. In *Richette v. Solomon*, 410 Pa. 6, 187 A.2d 910 (1963), a railroad worker was injured on the job and could no longer work. After the railroad worker exhausted his retirement benefits, the railroad company contacted the worker and informed him that it would be in his best interests to deal with the railroad company directly and to settle his workers compensation claim. *Id.* at 913. The company gave the injured worker $250 for living expenses. *Id.* After the injured worker exhausted that money, he contacted his union in order to discuss the accident and remuneration. *Id.* When the union failed to return his call, the railroad worker hired an attorney. *Id.* Once the company discovered that the injured worker had hired an attorney, the company told him that he could not have any more money until he fired his attorney. *Id.* at 913–14. The injured worker, who was desperate for money to cover his family's living expenses, wrote a letter as dictated by the railroad company, firing his attorney. *Id.* The Supreme Court held that "[l]ogic, sequence of

events, and palpable circumstances justif[ied the jury's] conclusion" that "the named defendants coordinated, through wile, stratagem and deception to separate an attorney from his client." *Id.* at 914.

Similarly, in the case before us, logic, sequence of events, and the circumstances surrounding Empire's claim allowed the jury to conclude that Appellant coordinated a scheme of deception and inflicted financial strain in order to lower the cost of hauling coal. The record contained sufficient evidence to warrant the jury's finding that Appellant's actions were outside of what society views as socially acceptable "rules of the game" in business dealings.

Finally, Appellant asserts that Empire did not suffer any damages as a result of Appellant's actions, which is the final element of this cause of action. The jury found that Appellant caused the subcontractors to break their contracts with Empire. Had the subcontractors not ended their contracts with Empire, Empire would have received 8% of the base rate for the loads hauled by the subcontractors. N.T. at 332, 450–52. Appellant asserts that the trial court abused its discretion in allowing Empire's accounting expert to testify as to damages. Appellant's Brief at 27. However, as Empire avers, this line of argument is waived for failing to raise it before the trial court. Pa.R.A.P. 302(a), 2117(c), 2119(e); *see Dixon v. Geico*, 1 A.3d 921, 925 (Pa.Super.2010) (failure to preserve issues results in waiver). There was sufficient evidence to warrant a finding of damages. The trial court did not abuse its discretion in denying Appellant's request for JNOV pursuant to its claim that Empire failed to establish the elements of tortious interference with a contract.

Appellant's next four issues contest Empire's award of punitive damages. First, Appellant contends that Em-

pire failed to establish evidence of wanton, willful, or reckless conduct, which is required for an award of punitive damages. In this regard, Appellant's argument amounts to a challenge to the weight of the evidence. Our standard of review is well-settled:

> This Court has repeatedly emphasized that it is not only a[ ] court's inherent fundamental and salutary power, but its duty to grant a new trial when it believes the verdict was against the weight of the evidence and resulted in a miscarriage of justice. Although a new trial should not be granted because of a mere conflict in testimony or because the [court] on the same facts would have arrived at a different conclusion, a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

*Armbruster v. Horowitz,* 744 A.2d 285, 287 (Pa.Super.1999), *aff'd,* 572 Pa. 1, 813 A.2d 698 (2002). Our Supreme Court has held:

> The standard governing the award of punitive damages in Pennsylvania is settled. "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742, 747 (1984) (*quoting* Restatement (Second) of Torts § 908(2) (1979)); *see also Chambers v. Montgomery,* 411 Pa. 339, 192 A.2d 355, 358 (1963). As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct. *See SHV Coal, Inc. v. Continental Grain Co.,* 526 Pa. 489, 587 A.2d 702, 704 (1991); *Feld,* 485 A.2d at 747–

48; *Chambers,* 192 A.2d at 358. *See also* Restatement (Second) of Torts § 908, comment b. The purpose of punitive damages is to punish a tortfeasor for outrageous conduct and to deter him or others like him from similar conduct. *Kirkbride v. Lisbon Contractors, Inc.,* 521 Pa. 97, 555 A.2d 800, 803 (1989); Restatement (Second) of Torts § 908(1) ("Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future."). Additionally, this Court has stressed that, when assessing the propriety of the imposition of punitive damages, "[t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." *See Feld,* 485 A.2d at 748; *see also Martin v. Johns–Manville Corp.,* 508 Pa. 154, 494 A.2d 1088, 1097 n. 12 (1985) (plurality opinion).

*Hutchison ex rel. Hutchison v. Luddy,* 582 Pa. 114, 870 A.2d 766, 770–71 (2005).

▇▇▇ Appellant claims that a finding of willful, reckless, and outrageous conduct on its part was against the weight of the evidence because Appellant's actions were justified. Appellant withheld payment from Empire only because it had previously overpaid Empire in the form of fuel surcharges. Appellant made no intentional misrepresentations to the subcontractors regarding Empire, and Appellant was acting to protect its business interests. Appellant's Brief at 31–33. These claims are without merit.

Evidence established that Appellant acted dishonestly in informing Empire that payment was forthcoming and in informing the subcontractors that Empire had been paid and had either quit or been fired. We have previously found such dishonesty and lack of business ethics to warrant an

award of punitive damages. *See Jeannette Paper Co. v. Longview Fibre Co.,* 378 Pa.Super. 148, 548 A.2d 319, 327–28 (1988) (finding punitive damages proper where defendant broke contract with broker after receiving information from broker regarding potential customer, and then sold to that customer directly). While Appellant asserted during trial, and now asserts on appeal, that it acted honestly and was justified in protecting its business interests, testimony from Appellant and three of its subcontractors established otherwise. Based upon our review of the record, the jury's finding that Appellant acted willfully, recklessly, and outrageously does not shock the conscience of the court. The trial court did not abuse its discretion in denying Appellant's request for a new trial.

 Appellant's final three issues are interrelated, and we resolve them together. Appellant argues that the amount of punitive damages was disproportionate to the compensatory damages and contrary to case law; grossly disproportionate to the character of Appellant's acts and the nature of harm suffered by Empire; and against the weight of the evidence. Our standard of review of claims regarding punitive damages is as follows:

> [T]he law of this Commonwealth calls for the appellate courts to determine whether the trial court has committed any abuse of discretion when reviewing a jury's punitive damage verdict, or whether on complete and exhaustive review of the record it shocks the court's sense of justice in a given case.

*Sprague v. Walter,* 441 Pa.Super. 1, 656 A.2d 890, 928 (1995). We evaluate the award of punitive damages with respect to the following principles:

Under Pennsylvania law the "size of a punitive damages award must be reasonably related to the State's interest in punishing and deterring the particular behavior of the defendant and not the product of arbitrariness or unfettered discretion." *Shiner v. Moriarty,* 706 A.2d 1228, 1241 (Pa.Super.1998). In accordance with this limitation, "[t]he standard under which punitive damages are measured in Pennsylvania requires analysis of the following factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant." *Pioneer Comm. Funding Corp. v. Am. Fin. Mortg. Corp.,* 797 A.2d 269, 290 (Pa.Super.2002).

*Hollock v. Erie Ins. Exch.,* 842 A.2d 409, 419 (Pa.Super.2004).

In *Hollock,* we approved punitive damages at a ratio of ten to one to compensatory damages. *Id.* at 422. We found that the ratio did not violate due process when considering "[the defendant's] reprehensible conduct, its significant wealth, and the limited compensatory award." *Id.* The defendant in *Hollock,* Erie Insurance Exchange, was found to have acted in bad faith based upon the plaintiff's claim that Erie failed to investigate, process, and satisfy her claim in a reasonable time, failed to schedule timely medical examinations, asserted defenses without a reasonable basis in fact, forced plaintiff to arbitration on a clear claim, delayed the arbitration hearing, retained experts to provide biased opinions unsupported by evidence, and attempted to "low-ball" plaintiff in settlement negotiations. *Id.* at 412.

 The ratio of punitive damages to compensatory damages in this case is 5.6 to 1,[3] significantly lower than the ratio in *Hollock.* As illustrated by the record in

---

**3.** Empire was awarded $271,000 in compensatory damages and $1.5 million in punitive damages.

this case, Appellant caused Empire and the subcontractors significant financial hardship and engaged in acts of deception, harming Empire and the subcontractors, all to Appellant's own financial benefit. Appellant's actions harmed Empire's reputation and caused financial distress. Moreover, the trial court found that Appellant had retained nearly $22.5 million in earnings in 2008. T.C.O. at 34. The trial court did not abuse its discretion in finding that Appellant's punitive damages were not grossly disproportionate to the compensatory damages, and that the award was not contrary to law. The punitive damages were not so high so as to shock the conscience of the court. We find no basis to disturb either the jury's award of punitive damages, or the trial court's refusal to set that award aside.

Judgment affirmed. Jurisdiction relinquished.