J. A17031/19

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

BOOMERANG RECOVERIES, LLC, : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
           Appellant :
:
           v. :
:
GUY CARPENTER & COMPANY, LLC : No. 2557 EDA 2018
AND MARSH & McLENNAN :
COMPANIES, INC. :


Appeal from the Judgment Entered August 16, 2018,
in the Court of Common Pleas of Philadelphia County
Civil Division at No. December Term, 2014, No. 1381


BEFORE: PANELLA, P.J., OLSON, J., AND FORD ELLIOTT, P.J.E.


MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED SEPTEMBER 25, 2019**

Boomerang Recoveries, LLC appeals from the August 16, 2018 judgment entered in the Court of Common Pleas of Philadelphia County in favor of Guy Carpenter & Company, LLC ("GC"),[1] after the trial court denied appellant's motion to remove the nonsuit. We affirm.

The trial court set forth the factual history as follows:

> GC has served as [Farmers Insurance Company of Flemington's ("Farmers")] reinsurance broker for a number of years, working on behalf of Farmers to procure catastrophic loss reinsurance policies. In

---

[1] We note that Marsh & McLennan Companies, Inc. ("Marsh & McLennan") are not a party to this appeal. The record reveals that in an order entered October 4, 2016, the trial court bifurcated appellant's claim of piercing the corporate veil (alter ego) against Marsh & McLennan from appellant's claims against GC. (**See** trial court order, 10/3/16.)

exchange, Farmers pays GC a brokerage fee equal to 10% of its reinsurance premium payments.

In early June 2013, Farmers hired [appellant] to conduct a review of its reinsurance premium payments for the years 2003 to 2013 in an effort to discover whether it had overpaid on its reinsurance premiums. Specifically, [appellant] was to provide "reinsurance review, recast, and recovery submissions to recover additional dollars for Farmers . . . ." For its efforts, [appellant] would receive 35% of any amount "actually collected" by Farmers "through the recovery submission process."

[Appellant] conducted its review and submitted its findings through two reports delivered to Farmers on January 6, 2014 and January 15, 2014, respectively. A corrected report for the years 2003 to 2007 was sent January 23, 2014. The reports collectively explained that Farmers had overpaid its reinsurance providers a sum of $2,246,014.65 during the relevant time period.

Upon receiving these reports, Farmers' controller, Michele Lukens ("Lukens"), forwarded them to David Thomas ("Thomas") and Eric Yeager ("Yeager"), the Managing Director and Senior Vice President of GC, respectively. Lukens asked Thomas and Yeager to review [appellant's] findings and contact [appellant] should they have any questions. Notably, they were not asked to submit [appellant's] findings to Farmers' reinsurance providers for recovery.

On January 24, 2014, Thomas and Yeager met with Lukens and Farmers' CEO, Scott St. Angel ("St. Angel"), to conduct a "post renewal debrief." Also on the agenda was a review of [appellant's] reports. [Appellant] was not present at the meeting, though it is worth noting that [appellant] was advised of the meeting in a January 22, 2014 email from Yeager.

In discussing [appellant's] reports, Thomas and Yeager pointed out two areas where [appellant] discovered errors in how GC had been calculating Farmers' reinsurance premiums – and admitted it should correct for those errors. GC did not, however, agree with how [appellant] calculated Farmers' Burglary, Robbery, and Theft ("BRT") deduction, and that disagreement has been the linchpin in the parties' instant dispute.

GC explained [appellant's] method for calculating Farmers' BRT deduction ("the Boomerang method") was different from the method GC – and thus, Farmers and its reinsurers – had been following in the previous years ("the GC method"). GC explained how it and [appellant] each calculated the BRT deduction by showing those calculations in a side-by-side chart using Farmers' 2013 reinsurance payments as an example. That chart revealed the Boomerang method would result in a higher possible recovery for Farmers than the GC method – that is, if the reinsurers ultimately agreed with [appellant's] calculations.

During their explanation of the two methods, neither Thomas nor Yeager commented on which method Farmers should use. They simply presented a side-by-side comparison of the two methods and allowed Farmers to decide which method to follow. At no point in time did they describe [appellant's] method as incorrect, unethical, or improper.

St. Angel testified he was not "led to believe anything" and that he formed his own opinion and made his own decision to disregard the Boomerang method. Similarly, Lukens swore in her deposition that GC simply explained [appellant's] interpretation of BRT and did not disparage [appellant's] calculation in any way.

Farmers ultimately decided [to] follow the GC method for calculating BRT. St. Angel's rationale was simple – "if it ain't broke, don't fix it." Lukens shared St. Angel's rationale, as she was concerned that Farmers' reinsurers would look to conduct an audit on

all of Farmers' reinsurance premiums if Farmers began using a different BRT calculation method, such as the one [appellant] proposed. Notably, Lukens' concern about an audit existed prior to the January 24, 2014 meeting with GC, as the risk of an audit was a question she raised to GC without prompting.

After deciding to use the GC method to calculate BRT, Farmers requested that GC conduct its own review of Farmers' reinsurance premium payments from 2003 to 2013 using the GC method. That review took place between January and June 2014.

In May 2014, Farmers informed [appellant] it was not following [appellant's] calculations and explained the reasoning behind its decision. [Appellant] attempted to persuade Farmers the GC method was incorrect in a detailed email, but Farmers did not alter its decision.

The relationship between Farmers and [appellant] ended unceremoniously in the summer of 2014. In July 2014, following a request for payment from [appellant], St. Angel sent an email to [appellant] further reiterating Farmers' position regarding [appellant's] calculations. In that email, St. Angel explained his belief that [appellant's] calculations were "one-sided[,"] taking into account only those factors that benefitted Farmers, rather than "taking into account all factors." He further explained that Farmers "values its reputation for maintaining the highest ethical standards and Farmers has no intention of pursuing any questionable recoveries or sums not owed."

[Appellant] contends these beliefs expressed by St. Angel in July 2014 were improperly influenced by actions taken and statements made by GC during the January 24, 2014 meeting. This suit followed.

Trial court opinion, 8/2/18 at 2-6 (citations to the record and original brackets omitted).

The record reveals that appellant initiated an action against GC and Marsh & McLennan on December 9, 2014. Appellant amended its complaint numerous times during the course of litigation. In its seventh amended complaint ("complaint"), appellant claimed, *inter alia*, tortious interference by GC with the contractual relationship appellant had with Farmers. In the complaint, appellant averred, *inter alia*, that as a result of GC's alleged tortious interference, appellant was denied fees owed by Farmers based upon two reinsurance review findings reports submitted to Farmers in January 2014 and a supplemental findings report submitted to Farmers in June 2015. (*See* appellant's seventh amended complaint, 5/9/2016 at 38-44.)

The trial court granted GC's motion for partial summary judgment and dismissed the portion of appellant's tortious interference claim based upon the June 2015 supplemental findings report. The trial court also granted GC's motion *in limine* to exclude evidence relating to non-party Co-Operative Insurance Company of Vermont ("Co-Operative Insurance").

During the jury trial, the trial court granted GC's motion for compulsory nonsuit made pursuant to Pa.R.Civ.P. 230.1 and entered the nonsuit in favor of GC on June 13, 2018. Appellant filed a timely motion to remove the nonsuit pursuant to Rule 227.1(a)(3), which the trial court denied. On August 16, 2018, upon appellant's filing of a praecipe, judgment in favor of GC was entered.

Appellant filed a timely notice of appeal. The trial court did not order appellant to file a concise statement of errors complained of on appeal. However, the trial court filed a Rule 1925(a) opinion relying on its August 2, 2018 order and opinion denying appellant's motion to remove the nonsuit.

Appellant raises the following issues for our review:

> [1.] Did the [trial] court err by granting [GC's] motion *in limine* when the proposed evidence was probative and not prejudicial?[2]
>
> [2.] Did the [trial] court err when it entered a nonsuit in favor of [GC] after the [trial] court ignored evidence, accepted [GC's] interpretation of the evidence, and otherwise acted as a factfinder?
>
> [3.] Did the [trial] court err by entering partial summary judgment in favor of [GC] after the [trial] court ignored the relevant law?

Appellant's brief at 4.[3]

This court has defined the elements of tortious interference with a contractual relationship as follows:

> (1) The existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the

---

[2] We note that although the trial court granted several of GC's motions *in limine*, a review of appellant's brief demonstrates appellant only challenges the motion *in limine* to exclude evidence relating to Co-Operative Insurance.

[3] For ease of disposition, we have re-ordered and re-numbered appellant's issues.

occasioning of actual damage as a result of defendant's conduct.

***Empire Trucking Co., Inc. v. Reading Anthracite Coal Co.***, 71 A.3d 923, 933 (Pa.Super. 2013) (original brackets omitted), citing Restatement (Second) of Torts § 766 (1979). This court in ***Empire Trucking*** explained:

> "The second element requires proof that the defendant acted 'for the specific purpose of causing harm to the plaintiff.'" ***Phillips v. Selig***, 959 A.2d 420, 429 (Pa.Super.2008) []. The second element of this cause of action is closely intertwined with the third element, which requires a showing that [a]ppellant's actions were not privileged. ***See*** Restatement (Second) of Torts § 766. Thus, in order to succeed in a cause of action for tortious interference with a contract, a plaintiff must prove not only that a defendant acted intentionally to harm the plaintiff, but also that those actions were improper. . . .
>
> Courts require a showing of both harm and improper conduct because we have recognized that some intentionally harmful conduct is done "at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff." ***Phillips***, 959 A.2d at 430

***Empire Trucking***, 71 A.3d at 933-934.

Appellant first claims the trial court erred in granting the motion

*in limine* to exclude evidence of an email from GC to Co-Operative Insurance.

> When reviewing rulings on motion *in limine*, we apply the scope of review appropriate to the particular evidentiary matter. . . . In reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law.

***Rachlin v Edmison***, 813 A.2d 862, 869 (Pa.Super. 2002) (***en banc***)

(citations omitted).

> An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

***Paden v. Baker Concrete Constr., Inc.***, 658 A.2d 341, 343 (Pa.Super. 1995), citing ***Mielcuszny v. Rosol***, 176 A. 236, 237 (Pa. 1934).

Pennsylvania Rule of Evidence 401 states, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.Evid. 401.

Here, appellant argues "[t]his evidence is relevant[] because it demonstrates that [the Boomerang method] . . . is accurate . . . ." (Appellant's brief at 57.) However, whether the Boomerang method is accurate or is the better calculation method is not a fact of consequence in a tortious interference action. As the trial court, in excluding the email evidence,[4] explained, "[t]he superiority of either method, however, is frankly irrelevant to the determination of this court. Farmers' decision to discontinue its relationship with [appellant] and to follow the GC method was not

---

[4] We note that the email stated, in part, "[GC has] reviewed the results of [appellant's] analysis and generally speaking their approach to calculating subject premium is correct – from a contractual perspective . . . ." (***See*** appellant's reproduced record, Vol. 2 at RR2238-2240.)

motivated by a belief the [GC] method was superior . . . ." (Trial court opinion, 8/2/18 at 7.)

We find no abuse of discretion or error of law in the trial court's conclusion to exclude the email evidence. Appellant has failed to meet its burden, and therefore, appellant's claim that the trial court erred in granting the motion **in limine** fails.

Appellant next claims the trial court erred in denying the motion to remove the nonsuit. When presented with a challenge to the order denying a motion to remove a nonsuit, this court will only reverse that order if there has been an abuse of discretion or an error of law. **See Rachlin**, 813 A.2d at 868.

> A motion for compulsory non-suit allows a defendant to test the sufficiency of a plaintiff's evidence and may be entered only in cases where it is clear that the plaintiff has not established a cause of action; in making this determination, the plaintiff must be given the benefit of all reasonable inferences arising from the evidence. When so viewed, a non-suit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action; it is the duty of the trial court to make this determination prior to the submission of the case to the jury. When this Court reviews the grant of a non-suit, we must resolve all conflicts in the evidence in favor of the party against whom the non-suit was entered.
>
> A compulsory non-suit is proper only where the facts and circumstances compel the conclusion that the defendants are not liable upon the cause of action pleaded by the plaintiff.

**Id.** (emphasis, original brackets, and citations omitted).

Here, the trial court concluded that appellant failed to establish the second and third prongs of its tortious interference claim.[5] The trial court explained, "[a]t the close of [appellant's] case, [the trial] court found [appellant] had not provided the jury with one witness, email, or document 'that remotely, inferentially, or circumstantially showed that [GC] had a specific intent to harm [appellant].'" (Trial court opinion, 8/2/18 at 1.) Furthermore, the trial court, in concluding GC's actions with Farmers were proper and privileged, stated:

> [Appellant] has not identified one lie or misleading statement made by GC to Farmers. GC conducted this review at the behest of Famers [sic] and the undisputed evidence showed GC conducted that review fully and honestly. An objective explanation of both methods was provided, which allowed Farmers to make an informed decision. There was simply no bad act presented that suggested GC acted outside "the rules of the game."

*Id.* at 15.

Appellant baldly asserts that "telling Farmers to conceal what [GC] was doing from [appellant]; lying to Farmers about [appellant's] work product; instructing Farmers to ignore [appellant's] methodology; and performing a phony audit in order to make [appellant] look bad" was direct evidence of GC's intent to harm appellant's contractual relationship with Farmers. (Appellant's brief at 32.) Appellant further alleged that GC's conduct, which

---

[5] The record reveals that appellant has established the first prong by evidence of its contract with Farmers. (**See** appellant's reproduced record, Vol. 1 at RR0153.)

- 10 -

allegedly included among other things, failing to advise Farmers that the Boomerang method was acceptable, was deceptive and self-dealing and, therefore, not privileged and justified. (*Id.* at 38-44.) A review of the record, however, does not support appellant's argument.

The record reveals that the president and CEO of Farmers, St. Angel, when asked why Farmers chose to continue using the GC method versus the Boomerang method for calculating Farmers' BRT deduction, stated, "[t]he rationale behind my decision was more to the effect of if it ain't broke, don't fix it. If we're not doing it incorrectly, there's no point in changing." (Notes of testimony, 6/5/18, morning session at 126.) Farmers had its own opinion on which method to use and made its own decision. (*Id.* at 124.) St. Angel further explained that part of the decision was based upon Farmers' own review in which it determined that appellant's report only identified areas in which Farmers had over-paid premiums but failed to identify areas where Farmers may have under-paid premiums and would owe additional money. (*Id.* at 129.) GC explained to Farmers that both the Boomerang calculation method and the GC calculation method were correct and ultimately it was Farmers' decision on how they wanted to proceed. (*Id.* at 37, 85-87.)

When giving appellant the benefit of all reasonable inferences arising from the evidence, the evidence supports the trial court's conclusion that appellant failed to present sufficient evidence to establish a tortious interference cause of action; specifically, appellant failed to demonstrate that

GC acted improperly and with the intent to harm appellant's contractual relationship with Farmers. We discern no error of law or abuse of discretion in the trial court's denying of appellant's motion to remove the nonsuit. Consequently, appellant's claim lacks merit.

In its final issue, appellant claims the trial court erred in granting GC's motion for partial summary judgment, thereby dismissing appellant's cause of action for alleged tortious interference based upon appellant's June 2015 supplemental findings report submitted to Farmers. We need not address this issue in light of appellant's failure to present sufficient evidence to establish a cause of action for tortious interference. Therefore, appellant's claim the trial court erred in granting the motion for partial summary judgment is moot.[6]

Judgment affirmed.

---

[6] We note that even if appellant was able to present evidence to establish a claim for tortious interference based upon its January 2014 reinsurance review findings reports, the trial court did not err or commit an abuse of discretion in granting the motion for partial summary judgment. A review of the record demonstrates that Farmers terminated its contract with appellant in July 2014, and therefore, the supplemental findings report appellant produced in June 2015 cannot be the basis of a claim for damages in a tortious interference cause of action since no contractual relationship between appellant and Farmers existed at the time the report was produced. *See Empire Trucking*, 71 A.3d at 933 (explaining that the first element of a tortious interference claim is the existence of a contractual relationship between the complainant and a third party).

J. A17031/19

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/25/19