J-A24019-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| USI INSURANCE SERVICES NATIONAL, INC. F/K/A AND F/D/B/A WELLS FARGO INSURANCE SERVICES USA, INC. V. ERIC M. FRIEMAN AND RCM&D SELFINSURED SERVICES COMPANY, INC. D/B/A RCM&D | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : | No. 2163 EDA 2020 |
| USI INSURANCE SERVICES NATIONAL, INC. F/K/A AND F/D/B/A WELLS FARGO INSURANCE SERVICES USA, INC. | : : : : : : | |
| Appellant | : : | |
| V. ERIC M. FRIEMAN AND RCM&D SELFINSURED SERVICES COMPANY, INC. D/B/A RCM&D | : : | |

Appeal from the Judgment Entered October 23, 2020
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  No. 180100954

| | | |
|---|---|---|
| USI INSURANCE SERVICES NATIONAL, INC. F/K/A AND F/D/B/A WELLS FARGO INSURANCE SERVICES USA, INC. V. ERIC M. FRIEMAN AND RCM&D SELFINSURED SERVICES COMPANY, INC. D/B/A RCM&D | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : | No. 2211 EDA 2020 |
| USI INSURANCE SERVICES NATIONAL, INC. F/K/A AND F/D/B/A WELLS FARGO INSURANCE SERVICES USA, INC. | : : : : : : | |
| Appellant | : : : : | |

V. ERIC M. FRIEMAN AND RCM&D  :
SELFINSURED SERVICES COMPANY,
INC. D/B/A RCM&D

Appeal from the Judgment Entered October 23, 2020
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  No. 180100954

BEFORE:   LAZARUS, J., DUBOW, J., and PELLEGRINI, J.[*]

MEMORANDUM BY DUBOW, J.:                    **FILED FEBRUARY 9, 2022**

USI Insurance Service National, Inc., et al. ("USI") and Eric M. Frieman ("Frieman") have filed these cross-appeals from the October 23, 2020 judgment entered after a bench trial in this action in which USI alleged that Frieman breached a non-solicitation and non-compete agreement.[1]  After careful review, we affirm.

The facts and procedural history are as follows.  In 2008, Frieman began working for USI's predecessor-in-interest, Wells Fargo,[2] as an insurance sales executive for employer benefits.  In the insurance industry, this position is

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] USI also claimed that RCM&D Self-Insured Services Company, Inc. ("RCM&D") intentionally interfered with USI's contractual relationship with Frieman.  For reasons explained below, the trial court found in favor of RCM&D on this claim.  RCM&D filed a notice of appeal from the trial court's verdict, but on December 3, 2020, discontinued its appeal by *praecipe*.

[2] USI is the successor-in-interest to Wells Fargo, who was Frieman's employer from 2008-2016.  On December 1, 2017, after Frieman had left Wells Fargo's employ, USI purchased all the equity interests of Wells Fargo.  As USI purchased Wells Fargo, Wells Fargo changed its name to "USI Insurance Services International, Inc."  It is this entity who filed this breach of contract action against Frieman.  Therefore, throughout this memorandum, we refer to Wells Fargo as USI.

known as a "producer." Producers are responsible for initiating new client relationships on behalf of the firm. Once the client relationship is established, a producer becomes the "face of the firm."[3]

In 2010, USI required its producers to execute an agreement that contained non-solicitation and non-compete provisions (the "Agreement"). Frieman signed the Agreement on July 22, 2010. The Agreement prohibited Frieman from, *inter alia*, soliciting and accepting business from clients he serviced while employed by USI for a period of two years after leaving the employment of USI for any reason. Relevantly, the Agreement also required Frieman to "communicate the contents of . . . the non-solicitation and non-disclosure sections of this Agreement to any prospective employer."[4] USI provided Frieman with additional consideration in exchange for signing the Agreement. Specifically, Frieman became eligible to participate in USI's new performance-based compensation plan (the "Producer Plan"), which entitled him to receive an "[a]dditional 1% on [n]ew [r]evenue and [a]dditional 1% on [n]et [n]ew [r]evenue" as defined in the Producer Plan.[5]

Frieman left his job at USI in November 2016, and began working for a competitor, RCM&D Self-Insured Services Company, Inc. ("RCM&D"), also as a producer. Prior to being hired, Frieman informed RCM&D that he had

---

[3] Trial Ct. Op., 4/15/21, at 5.

[4] Agreement § IV. Injunctive Relief & Damages.

[5] Producer Plan Appendix A.

- 3 -

entered into the non-solicitation Agreement with USI but represented to RCM&D that the Agreement was invalid and not enforceable because his signature on it had been forged.[6] RCM&D and Frieman had several conversations about Frieman soliciting USI's clients and RCM&D knew that Frieman would solicit the clients whom he serviced while employed by USI to bring their business to RCM&D. Early in his employment with RCM&D, Frieman created and submitted to RCM&D a business plan in which he identified as one of his business objectives soliciting the clients whom he serviced while employed by USI to bring their business to RCM&D.

Frieman proceeded to solicit 18 clients with whom he worked while employed by USI, and those clients subsequently moved their business to RCMD. As a result, USI lost approximately $1.1 million per year in revenue.

On January 5, 2018, USI filed a complaint raising one count of Breach of Contract against Frieman and one count of Intentional Interference with Contract against RCM&D. Following discovery and the filing of pre-trial motions in *limine*, on July 15, 2019, this case proceeded to a two-day bench trial.

Relevantly, to refute Frieman's assertion that his signature on the Agreement had been forged, USI presented the testimony of, and a report authored by, J. Wright Leonard, a forensic document examiner. Ms Leonard,

---

[6] Despite taking the position that his signature had been forged, Frieman admitted that even after discovering the supposedly forged document in his employment file, he did not report the alleged forgery to anyone at USI. N.T. Trial, 7/15/19, at 101.

whom the trial court qualified as an expert in document and handwriting examination and analysis, described the similarities and differences between Frieman's signature on the Agreement and the signatures on a September 1, 2005 deed and an October 4, 2010 mortgage. Ms. Leonard testified that there were "indications" that the same person who signed the Agreement also signed the deed and the mortgage.[7] She explained that she used the term "indications" as a qualified opinion because of the limited number of comparison signature samples available to her and because she did not have the original, signed document to review.[8]

Frieman testified that he did not sign the Agreement and that he told prospective employers that his signature on the Agreement had been forged. Frieman denied that he has two styles of signature, and denied that the signature on the September 1, 2005 deed was his. He did, however, admit that he previously owned the property described in the September 1, 2005 deed, that he sold the property to the grantees listed on the deed, and that he sold the property listed in the deed for the amount listed on it. Frieman also denied placing his signature on the October 4, 2010 mortgage whereby Frieman and his wife borrowed $147,000 from Wells Fargo Bank. He did admit, however, that he received the $147,000 from Wells Fargo for the mortgage and that he has been paying back the mortgage.

---

[7] N.T. Trial, 7/15/19, at 154-56.

[8] *Id.* at 155-56, 163

With respect to the calculation of damages, USI presented the testimony of two expert witnesses: Robert Bryan Tilden, Jr., an expert in the retail insurance brokerage industry and agency evaluation; and Francis Brulenski, an expert in the evaluation and calculation of economic damages.[9]  Mr. Tilden's testimony pertained to USI's "retention rate" on the "book of business" serviced by USI as an average of 89%.  Based on this average retention rate, Mr. Brulenski opined as to the amount of loss suffered by USI as a result of Frieman's breach of the Agreement over a period of 10 years.  USI also submitted evidence of the gross commissions received by RCM&D for the 18 clients Frieman solicited in violation of the agreement totaling $1,073,560.00.

On June 23, 2020, after considering the testimony and evidence presented at trial and the parties' post-trial submissions, the trial court entered a verdict in favor of USI on its breach of contract claim against Frieman.  The court found that the non-solicitation Agreement between Frieman and USI was enforceable, Frieman has two styles of signature that he uses interchangeably, Frieman's signature had not been forged, and Frieman had breached the Agreement when he solicited USI's customers in his subsequent employment with RCM&D.  The court awarded USI $1,073,560.21 in damages.  With respect to USI's intentional interference with contract claim against RCM&D, the court determined that RCM&D reasonably

---

[9] The trial court also admitted into evidence expert reports authored by these witnesses.

believed that the Agreement was unenforceable based on Frieman's representations that someone had forged his signature on the Agreement and that RCM&D had not taken purposeful action to interfere with the contractual relationship between USI and Frieman. The court, therefore, entered a verdict in favor or RCM&D on this claim.

On July 2, 2020, USI filed a Motion to Mold the Verdict to include pre-judgment interest. All parties subsequently filed post-trial motions. On August 14, 2020, the trial court held a hearing on the motions. On October 17, 2020, the trial court entered three separate orders denying each of the outstanding motions.

On October 23, 2020, the trial court prothonotary entered judgment on the verdict and this appeal followed. The parties and the trial court have complied with Pa.R.A.P. 1925.

USI raises the following issues on appeal:

1. Did the trial court err as a matter of law in concluding that USI did not meet its burden to show that RCM&D interfered with USI's non-solicitation contract with Frieman, even though the court found that the evidence demonstrated that RCM&D (a) knew about Frieman's non-solicitation obligations, (b) expected Frieman to solicit prohibited clients upon joining RCM&D, (c) knew that Frieman actively solicited the business of eighteen (18) prohibited clients, and (d) facilitated the transfer of the business of prohibited clients to RCM&D?

2. Did the trial court err in refusing to award pre-judgment interest on the damages awarded to USI and against Frieman for breach of contract where the damages awarded constituted lost profits and USI was deprived of the use of those funds due to Frieman's breaches?

USI's Brief at 3-4.

Frieman and RCMD raise the following issues on appeal:

[1.] Did the trial court err by relieving USI of its burden to establish an enforceable contract[] by relying on Appellant's expert's testimony where she testified that there were mere "indications" that Frieman signed the agreements, which she admitted was a "very weak opinion" and could not testify that Frieman signed the agreements with a reasonable degree of professional certainty[] and where [USI] was unable to produce an original version of the signed agreements, did not present any witness to testify to Frieman signing the agreements, and failed to present any evidence at trial that Frieman received, reviewed, negotiated, and or returned the agreements to Appellant?

[2.] Did the trial court err in finding that [Frieman's] illusory change in compensation and resulting payment of $1,760 was sufficient "new and valuable" consideration as to bind [Frieman] to a post-employment restrictive covenant where the agreements said that Frieman would receive the new consideration even if he didn't sign, where the new agreement lowered commissions from other lines of business, and which imposed new thresholds before Frieman would be paid a commission on new business—potentially resulting in Frieman actually receiving less compensation, where the agreements were presented at a time where Frieman could not develop and new business that would be payable under the agreements, and where the $1,760 payment restricted Frieman from soliciting his million dollar book of business, which he could have sold for more than $900k, and where the $1,760 payment was approximately half of one percent (0.5%) of Frieman's commission-based salary?

[3.] Did the trial court err by awarding in excess of one million dollars ($1,000,000.00) in damages where [] Frieman developed seventeen (17) out of the eighteen (18) clients prior to joining [USI], where the revenue did not require investment by [USI] to generate that business, where [Frieman] was not previously bound by any restrictive covenants relating to that business, and where [USI's] only protectable interest in Frieman's clients extended to one client (CSX Logistics) that Frieman developed while employed and being paid by [USI], the damages for which [USI] admits was between forty thousand dollars ($40,000) and fifty[-]five thousand dollars ($55,000.00)?

[4.] Did the trial court err as a matter of law and/or abuse its discretion by awarding damages in excess of one million dollars

($1,000,000.00) as the total gross commission received by RCM&D without any deduction for the costs that USI would have incurred in generating the revenue if the clients didn't follow Frieman to his new employer, without taking into account actual commissions received by Frieman from the clients, or calculating the actual damage (or loss of profits) suffered by [USI] as a result of Frieman diverting those clients?

Frieman's Brief at 1-4.

**Appeal of USI**

**Intentional Interference with Contract Claim**

USI asserts that the trial court erred in not entering judgment notwithstanding the verdict ("JNOV") in its favor on its intentional interference with contract claim against RCMD. We review the denial of a request for JNOV for an error of law that controlled the outcome of the case or an abuse of discretion. *Hutchinson v. Penske Truck Leasing Co.*, 876 A.2d 978, 984 (Pa. Super. 2005). In this context, an "[a]buse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias or ill-will." *Id.*.

When reviewing the denial of a request for JNOV, the appellate court examines the evidence in the light most favorable to the verdict winner. *Thomas Jefferson Univ. v. Wapner*, 903 A.2d 565, 569 (Pa. Super. 2006). Thus, "the grant of [JNOV] should only be entered in a clear case[.]" *Id.* "Questions of credibility and conflicts in the evidence are for the trial court to resolve and the reviewing court should not reweigh the evidence. Absent an abuse of discretion, the trial court's determination will not be disturbed." *Holt*

***v. Navarro***, 932 A.2d 915, 919 (Pa. Super. 2007) (citation omitted). Our scope of review over questions of law, however, is plenary. ***Buckley v Exodus Transit & Storage Corp.***, 744 A.2d 298, 305 (Pa. Super. 1999).

There are two bases upon which a movant is entitled to JNOV: "one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." ***Rohm and Haas Co. v. Continental Cas. Co.***, 781 A.2d 1172, 1176 (Pa. 2001) (citation omitted). When an appellant challenges a verdict on this latter basis, we will grant relief only "when the [] verdict is so contrary to the evidence as to shock one's sense of justice." ***Sears, Roebuck & Co. v. 69th St. Retail Mall, L.P.***, 126 A.3d 959, 967 (Pa. Super. 2015) (citation omitted).

USI claims that the court misapplied the law to the evidence when it concluded that, although USI presented evidence that RCM&D was aware of Frieman's contractual obligations under the non-solicitation Agreement, USI failed to present evidence that RCMD took purposeful faction to interfere with those contractual obligations. USI's Brief at 22-23. USI argues, to the contrary, that the evidence at trial demonstrated that RCM&D intentionally and purposefully engaged in conduct designed to interfere with Frieman's contractual obligations under the Agreement, expected and instructed Frieman to solicit USI clients to move their business to RCM&D, and took steps to provide RCM&D security in case a court determined that the Agreement was valid. ***Id.*** at 23-24. USI argues that this evidence demonstrates that

- 10 -

RCM&D was not passively indifferent to Frieman's contractual obligations, but rather it calculated its actions to interfere with them. *Id.* at 25-26.

To prevail on a claim for intentional interference with contract, a plaintiff is required to prove, by a preponderance of the evidence four elements: (1) the existence of a contractual relationship between the complainant and a third party; (2) purposeful action on the part of the defendant intended to harm the existing relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) actual harm to the complainant as a result of the defendant's conduct. *Maverick Steel Co. v. Dick Corp./Barton Malow*, 54 A.3d 352, 354-55 (Pa. Super. 2012).

"The second element requires proof that the defendant acted **for the specific purpose of causing harm to the plaintiff** [and] is closely intertwined with the third element, which requires a showing that [the defendant]'s actions were not privileged." *Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 933–34 (Pa. Super. 2013) (internal citation and quotation marks omitted, emphasis added). *See also Glenn v. Point Park College*, 272 A.2d 895, 899 (Pa. 1971) ("It must be emphasized that the tort we are considering is an intentional one: the actor is acting as he does [f]or the purpose of causing harm to the plaintiff."). "Thus, in order to succeed in a cause of action for tortious interference with a contract, a plaintiff must prove not only that a defendant acted intentionally to harm the plaintiff, but also that those actions were improper." *Empire Trucking*, 71 A.3d at 934.

After considering the evidence presented by USI in support of this claim, the trial court concluded that USI "offered no evidence of purposeful action on the part of RCM&D that was specifically intended to harm the contractual relationship between USI and Frieman." Trial Ct. Op., 6/20/20, at 13. The trial court observed that the record evidence established that: (1) RCM&D had knowledge of the Agreement, but believed that it was invalid because Frieman had told RCM&D that his signature had been forged; (2) RCM&D had knowledge that Frieman intentionally violated the potentially-valid non-solicitation Agreement; (3) RCMD and Frieman had several conversations about Frieman soliciting the clients he serviced while employed by USI to migrate to RCM&D; and (4) Frieman created and submitted to RCM&D a plan of his business goals in which he listed migrating his book of USI clients to RCM&D. Trial Ct. Op., 4/15/21, at 24-25. Nevertheless, the court found that, notwithstanding that RCM&D "benefitted from Frieman's breach [of the Agreement] by receiving the solicited clients' business, and had knowledge of the potential violation, USI failed to establish any action taken by RCM&D to interfere with the Agreement." *Id.* at 25. Thus, the court concluded that USI failed to satisfy the second element of the tort of intentional interference with contract, that is, failed to establish that RCM&D acted for the specific purpose of causing harm to USI.

Evaluating the evidence in the light most favorable to RCM&D as we must, we agree with the trial court that despite offering proof that RCM&D was aware of the Agreement between USI and Frieman and benefitted from

Frieman's breach of the Agreement, USI failed to prove by a preponderance of the evidence that RCM&D acted with the specific purpose of causing harm to USI. Accordingly, the trial court did not abuse its discretion in denying USI's request for JNOV on its intentional interference with contract claim.[10]

**Denial of Claim for Liquidated Damages**

In its second issue, USI claims that the trial court erred in denying its motion to mold the verdict to include prejudgment interest on its verdict against Frieman.[11] USI's Brief at 31-41. "Our review of an award of pre-judgment interest is for abuse of discretion." *Cresci Constr. Serv., Inc. v. Martin*, 64 A.3d 254, 258 (Pa. Super. 2013) (citation omitted). An abuse of

---

[10] USI also claims that the court erred in concluding that USI did not prove the third element of its intentional interference with contract claim, *i.e.* that RCM&D's actions were "improper," and in ratifying RCM&D's conduct, which USI asserts violates the "rules of the game." *Id.* at 26-29. This claim is moot in light of our conclusion that the trial court did not err in determining that USI failed to adduce sufficient evidence to prove the second element of the claim.

[11] In support of this claim, USI asserts that the trial court abused its discretion by misapplying the four factors set forth in *Feather v. United Mine Workers of Am.*, 711 F.2d 530, 540 (3d Cir. 1983) (explaining that, in determining whether an award of prejudgment interest is appropriate, a court must consider: (1) whether the claimant has been less than diligent in prosecuting the action; (2) whether the defendant has been unjustly enriched; (3) whether an award would be compensatory; and (4) whether countervailing equitable considerations militate against a surcharge), and presents argument in its Brief pertaining to the four *Feather* factors including citation primarily to extra-jurisdictional authority. *See* USI's Brief at 31-40. We observe, however, that the *Feather* four-factor guide has not been adopted by Pennsylvania courts and that we are not bound by the decisions of the federal courts. *McEwing v. Lititz Mut. Ins. Co.*,77 A.3d 639, 648 n.7 (Pa. Super. 2013). We, thus, confine our analysis to the argument presented by USI and set forth *infra* that is grounded in Pennsylvania law.

discretion is more than a mere error in judgment; rather, it requires a finding that the trial court overrode or misapplied the law, or that the decision was manifestly unreasonable or the result of bias, prejudice, partiality, or ill-will as evidenced by the record. *Kraisinger v. Kraisinger*, 34 A.3d 168, 175 (Pa. Super. 2011).

Where the contract at issue sets forth a liquidated sum, pre-judgment interest is awarded as a matter of right. *Somerset Cmty Hosp. v. Allan B. Mitchell & Assocs, Inc.*, 685 A.2d 141, 148 (Pa. Super. 1996). Where, however, as here, the breach of contract damages are unliquidated, an award of pre-judgment interest is left to the discretion of the trial court, in light of all the circumstances. *See Cresci*, *supra* at 264; *Frank B. Bozzo, Inc. v. Electric Weld Div. of Fort Pitt Div. of Spang Indus., Inc.*, 498 A.2d 895, 901 (Pa. Super. 1985).

"[C]ompensation for delay in the nature of interest may [] be awarded if, in the circumstance of the case[,] justice so requires, . . . [such that] the plaintiff will not be fully compensated unless he receives compensation for the delay." *Bozzo*, 498 A.2d at 896, 900 (citation and internal quotation marks omitted). In other words, the plaintiff has suffered injuries that, for the plaintiff to be fully compensated for the loss from the breach, requires an interest award "added for the delay in obtaining the award of damages." *Id.* at 899 (citation omitted).

"The basic premise underlying the award of prejudgment interest to a party centers on the fact that the breaching party has deprived the injured

party of using interest accrued on money which was rightfully due and owing to the injured party." ***Widmer Eng'g, Inc. v. Dufalla***, 837 A.2d 459 (Pa. Super. 2003). To determine whether the circumstances of the case warrant an award of prejudgment interest, the court must consider whether the fault for nonpayment rests with the defendant or the plaintiff. ***Marrazzo v. Scranton Nehi Bottling Co.***, 263 A.2d 336, 338 (Pa. 1970). Where the fault of nonpayment rests with the defendant, an award to the plaintiff of prejudgment interest is appropriate. ***Id.***

Section 354 of the Restatement (Second) of Contracts addresses the recovery of prejudgment interest and has been adopted as the law of this Commonwealth. ***See Fernandez v. Levin***, 548 A.2d 1191, 1193 (Pa. 1988). Under subsection (2) of Section 354, if the sum due as a result of the breach of contract "cannot be determined by the party in breach with sufficient certainty to enable him to make a proper tender," the decision of whether to award prejudgment interest is left to judicial discretion[.]" Restatement (Second) of Contracts § 354 (cmt. d).

USI argues that "all fault for the consequential damages of Frieman's breach plainly rests with him[]" because: (1) he did not offer to compensate USI for the losses his breach of the Agreement caused; (2) he did not attempt to mitigate USI's losses; (3) he maintained his position that the Agreement was invalid in the face of compelling evidence to the contrary, which "forced USI to litigate this matter through trial and to incur the considerable costs and expenses associated therewith." USI's Brief at 40-41.

- 15 -

The trial court explained its denial of USI's motion to mold the verdict to include prejudgment interest as follows:

> This court's award has sufficiently and fully compensated USI for its losses from the clients solicited by Frieman. The award of interest as compensation for delay is the exception under Pennsylvania law and is used only in the most severe circumstances where the breaching party is at fault for not settling the dispute by paying the amount owed. Here, in a non-compete/non-solicit breach of contract, Frieman could not have immediately paid to USI an amount for the clients. There is no established method by which a company's good will from clients is calculated into dollar amounts, so Frieman is not at fault for the delay in compensation to USI. Frieman could not have paid compensation to USI at the time of the breach because any damages or loss involved several disputed factors that would change the calculated amount. Such changes include the time period for which each client stayed with USI, the amount of the revenue or profits generated by the clients, and the amounts paid by Frieman's new employer to secure those clients. Moreover, the nature of this breach, that is, a non-compete/non-solicit is not a type of purposeful delay of non-payment, but instead merely a dispute that required litigation to determine the amount lost.

Trial Ct. Op., 12/13/21, at 7 (unnecessary punctuation omitted).

In other words, the trial court concluded that the amount of damages due as a result of Frieman's breach of the Agreement was not sufficiently definite to allow him to make a proper determination of payment. Thus, the award of prejudgment interest was left to the trial court's discretion. In exercising its discretion, the trial court explained that because litigation was required to determine the amount lost, the fault for the delay in payment of the award did not rest with Frieman. As such, the trial court determined that USI was not entitled to prejudgment interest. We find no abuse of discretion in that determination. USI is not, therefore, entitled to relief on this claim.

**Frieman's Appeal**

**Weight of the Evidence**

In his first issue, Frieman claims that the trial court erred in finding that USI met its burden to prove that the Agreement was valid and enforceable. In particular, Frieman asserts that USI did not establish that there was the requisite "meeting of the minds" between USI and Frieman because it failed to prove that Frieman ever received, negotiated, agreed to, or signed the Agreement, did not produce an original version of the Agreement, did not provide testimony from a witness who saw Frieman sign the agreement, and, instead only provided the testimony of USI's Executive Vice President, Peter Gilbertson, who did not work for USI at the relevant time. Frieman's Brief at 36-40. Frieman further argues that the trial court erroneously relied on USI's expert's qualified opinion to determine that the signature on the Agreement was, in fact, Frieman's. *Id.* at 40-44. These claims essentially challenge the weight the trial court gave to the evidence.

When reviewing a weight claim, we are mindful of the following principles:

> Appellate review of a weight claim is a review of the [trial court's] exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction

that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*In re Estate of Smaling*, 80 A.3d 485, 490 (Pa. Super. 2013) (citing *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013)).

The trial court may award a new trial "only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion." *Samuel–Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 39 (Pa. 2011) (citation omitted). The "factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Id.* (citation omitted). A mere conflict in testimony is not a sufficient basis for a new trial. *Winschel v. Jain*, 925 A.2d 783, 788 (Pa. Super. 2007).

Frieman challenges the weight the trial court gave to the testimony of USI's witnesses, especially its expert witness, and the court's failure to credit Frieman's own testimony that his signature had been forged. In reaching its decision to find that the Agreement was valid and enforceable against Frieman, the court reviewed the evidence, which was conflicting, and credited USI's evidence. In particular, the trial court considered the exemplars of Frieman's signature on the Agreement, a deed, and a mortgage agreement provided as evidence by USI, and the testimony of USI's expert witness pertaining to these exemplars, and expressly found that the Frieman's testimony concerning the signature exemplars lacked credibility and

demonstrated that Frieman had two styles of signature that he used interchangeably. Trial Ct. Op., 4/15/21, at 11-16. Based on the weight it gave to the evidence and its credibility determinations, the court concluded that Frieman failed to prove that his signature on the Agreement was forged and, thus, it was enforceable against him. We cannot and will not reweigh the evidence or override the trial court's credibility determinations. Frieman is, therefore, not entitled to relief on this claim.

**Adequacy of the New Consideration**

In his second issue, Frieman asserts that the Agreement was unenforceable because USI did not pay him adequate new and valuable consideration to sign it. Frieman's Brief at 45-55. Frieman claims that the trial court erred by failing to consider the sufficiency of the consideration offered to Frieman—which ultimately amounted to $1,760—to sign the Agreement and ignored that the Agreement purportedly provided that Frieman would receive the adjustment in pay whether or not he signed the Agreement.[12] *Id.* Frieman argues that this consideration was illusory, *de*

---

[12] This claim is belied by the testimony of USI's regional finance manager, John Kluxen, that USI would not have calculated, much less paid, Frieman the new consideration if Frieman had not signed the Agreement. N.T., 7/15/19, at 1854-85.

*minimus*, and insufficient to bind an employee making in excess of $300,000 a year with a book of business worth in excess of $900,000.[13]  *Id.* at 49-55.

Where, as here, a non-compete agreement is required after an employee has already begun employment,

> it is enforceable only if the employee receives "new" and valuable consideration — that is, some corresponding benefit or a favorable change in employment status.  Sufficient new and valuable consideration has been found by our courts to include, *inter alia*, a promotion, a change from part-time to full-time employment, or even a change to a compensation package of bonuses, insurance benefits, and severance benefits.  Without new and valuable consideration, a restrictive covenant is unenforceable.

*Socko v. Mid-Atl. Sys. Of CPA, Inc.*, 126 A.3d 1266, 1275 (Pa. 2015) (citations and footnotes omitted).  *See also Davis & Warde, Inc. v. Tripodi*, 616 A.2d 1384, 1388 (Pa. Super. 1992) (concluding execution of non-compete clauses by former at-will employees was supported by adequate consideration; "[n]ot only were they offered continued employment with new responsibilities, but each was given a cash payment, a guarantee of certain job benefits, including a favorable change in the employer's automobile reimbursement policy, and a guaranteed severance benefit in the event of termination").

---

[13] Within this issue, Frieman has also asserted that "the restrictions are not in furtherance of protecting [USI's] legitimate interests."  Frieman's Brief at 55-59.  We decline to address this claim as it does not correspond with, and is not fairly suggested by, the issue as presented in Frieman's Statement of Questions Involved.  *Graziani v. Randolph*, 856 A.2d 1212, 1216 (Pa. Super. 2004); Pa.R.A.P. 2116(a) (stating, *inter alia*, "[n]o question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby").

"The adequacy of consideration to support a restrictive covenant is an issue of law." **Tripodi**, 616 A.2d at 1387. Pennsylvania courts have not established a bright-line rule governing the minimum quantum of consideration required to validate a post-employment restrictive covenant; however, our courts have found consideration for a new restrictive covenant obligation to be insufficient only in the clearest circumstances where the consideration was truly illusory or *de minimis*. **See**, **e.g.**, **George W. Kistler, Inc. v. O'Brien**, 347 A.2d 311, 314-16 (Pa. 1975) (payment of $1.00 and continued employment was insufficient); **Markson Bros. v. Redick**, 66 A.2d 218, 221 (Pa. Super. 1949) (reducing terms of oral employment agreement to writing without any change to terms was not adequate consideration to support restrictive covenants).

In contrast, this Court has held that a contractual promise that confers upon an employee an opportunity to make more money in the future is sufficient consideration to support a new restrictive covenant. **See**, **e.g.**, **Wainwright's Travel Serv., Inc. v. Schmolk**, 500 A.2d 476, 478 (Pa. Super. 1985) (holding that an employee's receipt of ownership interest in her company, which brought the potential for future gains, was a beneficial change in employment that was adequate consideration for her restrictive covenant); **Modern Laundry & Dry Cleaning Co. v. Farrer**, 536 A.2d 409, 412 (Pa. Super. 1988) (holding that the employee's "opportunity to increase his earnings due to his change in employment status is sufficient consideration to support the restrictive covenant in his employment contract.").

- 21 -

The trial court opined that: "Frieman received new and valuable consideration in the form of added compensation in exchange for signing the Agreement, as reflected by an increase in his commission rate for the 2010 plan year, which included an added one per cent (1%) of any new revenue, plus an extra one percent (1%) of the net new revenue." Trial Ct. Op., 4/15/21, at 18. It concluded that "[t]he increased commission rates on new revenue and also on net new revenue is a favorable change in Frieman's employment terms and is unlike the 'clearest circumstances' where Pennsylvania courts found the consideration 'truly illusory or *de minimis*.'" **Id.** at 19.

Given the foregoing, we find no basis to disturb the trial court's conclusion that the increased commission rates offered to Frieman in exchange for his assent to be bound by the Agreement—resulting in a payment of nearly $2,000—constituted new and valuable consideration. Accordingly, Frieman is not entitled to relief on this claim.

### Damages/Remittitur

In his final two issues, Frieman challenges the trial court's denial of his request for remittitur.[14] He asserts that the court committed reversible error when it calculated USI's damages by considering the revenue generated by

---

[14] Frieman has presented only one section of argument in support of his third and fourth issues in contravention of Pa.R.A.P. 2119(a) (requiring that "[t]he argument [] be divided into as many parts as there are questions to be argued[.]"). We, thus, consider these issues together and address only the arguments set forth and properly developed in this section.

RCMD from 18 clients misappropriated by Frieman without considering the "legitimate interests the agreement sought to protect[,]" *i.e.*, the loss of CLX Logistics as a USI client. Frieman's Brief at 59-60, 61-63. He argues that, because USI conceded that Frieman already had 17 of the 18 clients prior to his employment by USI and USI did not incur any expenses to develop those 17 clients, USI's only legitimate protectable interest causally related to Frieman's breach is the loss of the one client developed by Frieman during his USI employment—CLX Logistics. *Id.* at 61-62. He further claims that the damages award is not causally related to Frieman's breach because they do not account for the costs that USI would have incurred in generating the revenue or the actual lost profits suffered by USI because of Frieman diverting USI's clients. *Id.* at 60-61. Last, Frieman asserts that the damages award is excessive. *Id.* at 64-65.

The decision to grant a new trial limited to damages or a remittitur is within the trial court's discretion. *Tong-Summerford v. Abington Mem'l Hosp.*, 190 A.3d 631, 653 (Pa. Super. 2018). An appellate court will not find a verdict excessive unless it is so grossly excessive as to shock the court's sense of justice. *Whitaker v. Frankford Hosp. of City of Phila.*, 984 A.2d 512, 523 (Pa. Super. 2009) (citation omitted).

This Court has consistently held that:

> The determination of damages is a factual question to be decided by the fact-finder. The fact-finder must assess the testimony, by weighing the evidence and determining its credibility, and by accepting or rejecting the estimates of the damages given by the witnesses. Although the fact-finder may not render a verdict

based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages. The fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof.

*Discover Bank v. Booker*, 259 A.3d. 493, 497 (Pa. Super. 2021) (quoting

*Judge Tech. Servs., Inc. v. Clancy*, 813 A.2d 879, 885 (Pa. Super. 2002).

We afford the trial courts considerable deference to calculate damages.

*Dibish v. Ameriprise Fin., Inc.*, 134 A.3d 1079, 1089 (Pa. Super. 2016).

Furthermore, we are mindful that:

Damages for breach of contract should place the aggrieved party [] as nearly as possible in the same position it would have occupied if there had been no breach. To that end, the aggrieved party may recover all damages, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty.

*Ely v. Susquehanna Aquacultures, Inc.*, 130 A.3d 6, 10 (Pa. Super. 2015) (brackets, citation, and internal quotation marks omitted).

We first address Frieman's claim that USI had only a "legitimate protectable interest" in the business of USX Logistics because it was the only one of the 18 clients whose business Frieman improperly diverted to RCM&D that Frieman actually developed as a client during his period of employment with USI.

As the trial court aptly noted, we recognize that "trade secrets of an employer, customer goodwill and specialized training and skills required from the employer are all legitimate interests protectable through a general

- 24 -

restrictive covenant." **WMI Grp., Inc. v. Fox.**, 109 A.3d 740, 749 (Pa. Super. 2015). Additional protectable business interests of the employer include those that "relate to an employee's special skills; the safeguarding of customer goodwill; proprietary business information, including processes, trade secrets, and inventions; as well as the time and resources the employer has invested in the training of its employees." **Socko**, 126 A.3d at 1273.

Thus, as this non-exhaustive list makes clear, the time and expense to develop a client is not the only legitimate protectable business interest an employer may have and seek to protect through a restrictive covenant. The trial court found that USI designed the agreement to protect its legitimate business interests including: "the customer and client goodwill of USI in the clients whom Frieman serviced while employed with [USI], and the time and resources invested in training Frieman and maintaining its clients." Trial Ct. Op., 4/15/21, at 21 (citing to N.T. 7/15/19, at 33, 35-36, where Peter Gilbertson, USI's Executive Vice President, explained the purpose of the Agreement is to recognize the investment that USI makes over time in training its employees and maintaining its clients and that Frieman's clients are "complex" and "require typically a lot more resources beyond the producer. There's a team of people every day, day in and day out [that] are interacting with those clients. And those assets are delivered at a considerable expense and investment of the firm."). We agree and, therefore, conclude that Frieman's claim that USI had no legitimate business interest in clients developed by Frieman prior to his USI employment fails.

In addressing Frieman's claim that the trial court's damages award is excessive, the trial court explained that it based its damages calculation on the credible testimony and reports of USI's expert witnesses Mr. Tilden and Mr. Brulenski. We cannot and will not reweigh the experts' testimony or the trial court's conclusions based on the testimony. We, thus, conclude that the award of damages is within the range of USI's harm, was supported by competent evidence, and is not shocking in light of Frieman's misappropriation of 18 clients from USI. The trial court did not, therefore, abuse its discretion in denying Frieman's request for remittitur.

Judgment affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/09/2022